Argued and submitted March 6; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings August 28, 2020

STATE OF OREGON,
*Respondent on Review,*

*v.*

AUSTIN RAY HALTOM,
*Petitioner on Review.*

(CC 16CR55213) (CA A165666) (SC S066955)

472 P3d 246

Defendant was charged with second-degree sexual abuse, which is defined in ORS 163.425(1)(a) as "subject[ing] another person to sexual intercourse * * * and the victim does not consent thereto." Noting that ORS 163.425(1)(a) does not specify any particular mental state, defendant argued that the "victim does not consent" element of the offense was a part of the proscribed "conduct," for which, under the general culpability provisions of the Criminal Code, proof of a minimum mental state of "knowingly" is required. The trial court concluded, however, that the "does not consent" element is a circumstance, to which a minimum mental state of "criminal negligence" would attach—and, over defendant's objection, it instructed the jury in accordance with that theory. The jury found that defendant had been reckless with respect to the victim's nonconsent to sexual intercourse, but that he had not actually known that she had not consented. The trial court entered a judgment of conviction on the jury's verdict and defendant appealed, arguing that the trial court had erred in giving incorrect jury instructions and in entering a judgment of conviction when the jury had only found that he was reckless with respect to the victim's nonconsent. The Court of Appeals affirmed and defendant sought review. *Held*: The requirement in ORS 163.425 (1)(a) that the victim "does not consent" to the sexual conduct is an integral part of the conduct that the statute proscribes and proof of a minimum mental state of "knowingly" is required with respect to that element.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender.

------------

* On appeal from Yamhill County Circuit Court, Ladd Wiles, Judge. 298 Or App 533, 447 P3d 66 (2019).

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and file the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

NELSON, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**NELSON, J.**

In *State v. Simonov*, 358 Or 531, 546-48, 368 P3d 11 (2016), in the context of analyzing ORS 164.135(1)(a), a statute that criminalized using a vehicle "without consent of the owner,"[1] this court held that the "without consent" element of that offense is part of the "essential character" of the conduct that the statute proscribes, and therefore must be treated as a "conduct" element for purposes of determining the minimum mental state that attaches to the element when the statute fails to specify a mental state.[2] Relying on the fact that general provisions in the Criminal Code appear to contemplate at least a knowing mental state for any "conduct" element of a crime, we held that the state was required to prove that a defendant charged under ORS 164.135(1)(a) *knew* that the vehicle's owner had not consented to its use at the relevant time. *Id.* We rejected the state's argument that the "without consent" element was a "circumstance" element to which a minimum mental state of "criminal negligence" would attach.

Defendant in the present case was convicted of an entirely different crime of which lack of consent is an element—second-degree sexual abuse as defined in ORS 163.425(1)(a), *i.e.*, "subject[ing] another person to sexual intercourse" or certain other sexual acts when "the victim does not consent thereto." He contends that the "does not consent" element in ORS 163.425(1)(a) plays a similar role to that of the "without consent" element in the unauthorized

---

[1] *Simonov* analyzed the version of ORS 164.135(1)(a) that was in effect in 2016, when the case was decided. However, ORS 164.135 was amended in 2019, Or Laws 2019, ch 530, § 1, and section (1)(a) of the statute no longer contains the "without consent of the owner" wording that was at the center of the *Simonov* opinion. In this opinion, when we refer to ORS 164.135(1)(a), we are referring to the version of the statute that was analyzed in *Simonov*, *i.e.*, ORS 164.135(1)(a) (2015).

[2] As described in greater detail below, 366 Or at 797-99, 798 n 5, the general culpability statutes set out at ORS 161.085 to 161.115 appear to divide the material elements of an offense into three different categories—"conduct," "circumstances," and "results." As interpreted in *Simonov*, those statutes instruct that, when a statute defining a criminal offense fails to specify any mental state, the state must prove, for any "conduct" element of the offense, that the defendant had either an intentional or knowing mental state; but for "circumstance" and "results" elements, proof that the defendant had a knowing, reckless, or criminally negligent mental state will suffice. 358 Or at 538-40.

use of a vehicle (UUV) statute at issue in *Simonov*, and that, insofar as ORS 163.425(1)(a) does not specify a mental state that attaches to the "does not consent" element, both the analysis and ultimate conclusion in *Simonov* apply and establish that "knowingly" is the minimum mental state that attaches to the "does not consent" element. Thus, he argues that, to convict him under ORS 163.425(1)(a), the state was required to prove that he had engaged in sexual intercourse with the victim *knowing* that she did not consent and that the trial court therefore erred when it denied his request for an instruction to that effect and entered a judgment of conviction based on a jury finding that he had merely been reckless with respect to the victim's consent. Based on the analysis set out below, we conclude that the trial court erred and that the judgment of the trial court, and the Court of Appeals decision affirming that judgment, must be reversed.

## I.  BACKGROUND

The relevant facts are undisputed. Defendant was prosecuted on charges of first-degree rape and a lesser-included offense, second-degree sexual abuse as defined in ORS 163.425(1)(a),[3] based on evidence that, the morning after having had consensual intercourse with his 17-year-old then-girlfriend, he insisted on having intercourse again, ignoring her when she told him that it hurt and that she did not want to, and persisting as she lay there "frozen" and crying. Other evidence submitted at trial, including defendant's own testimony, raised factual issues as to whether defendant had understood the victim's protests and conduct as a refusal.

At trial, the parties disagreed about the minimum mental state that attached to the "does not consent" element of the second-degree sexual abuse charge. Defendant sought a jury instruction requiring the jury to find that he had acted with knowledge of the victim's nonconsent in order to convict, while the state sought an instruction that the jury could convict if it found that defendant's mental state

---

[3] As relevant here, ORS 163.425(1)(a) defines sexual abuse in the second degree as "subject[ing] another person to sexual intercourse *** and the victim does not consent thereto."

with respect to the victim's nonconsent had been knowing, reckless, or criminally negligent.[4] The trial court rejected defendant's argument that the "does not consent" element of second-degree sexual abuse was analogous to the "without consent" element in the unauthorized use of a vehicle crime at issue in *Simonov* and required the same analysis and, ultimately, the same minimum mental state (knowing) that was found to apply in that case. It agreed with the state that, with respect to the victim's nonconsent, the lesser mental states of criminal negligence and recklessness also would support a conviction on the second-degree sexual abuse charge. The trial court gave jury instructions that reflected the state's view and, at the state's suggestion, it issued a verdict form that listed three separate versions of the second-degree sexual abuse count, distinguished from one another only by the mental state that was specified for the "does not consent" element. Thus, all three versions of the second-degree sexual abuse count required findings that defendant had (1) subjected the victim to sexual intercourse; (2) on or around a specified date; (3) without the victim's consent—but the first version additionally required a finding that defendant "knew" that the victim did not consent, the second version required a finding that defendant "was aware of and consciously disregarded a substantial and unjustifiable risk that [the victim] did not consent," and the third version required a finding that defendant "failed to be aware of a substantial and unjustifiable risk that [the victim] did not consent." The jury found defendant "guilty" of the second version of the second-degree sexual abuse count (*i.e.*, it found that he "was aware of and consciously disregarded a substantial and unjustifiable risk that [the victim] did not consent") and "not guilty" of the rape charge and the other two versions of the sexual abuse charge. Thus,

---

[4] As noted, ORS 163.425(1)(a) uses the phrase "the victim does not consent" to refer to the element under consideration. Other statutes mentioned in this opinion use other wording to describe the nonconsent element—for example, ORS 164.135(1)(a), the UUV statute at issue in *Simonov*, uses the phrase "without consent of the owner." In this opinion, we quote the specific phrase used in the statute under discussion—"does not consent," "without consent," etc.—when that kind of specificity seems necessary or helpful in the context. When that level of specificity is not necessary—for example, when we are providing a factual description of the victim's conduct or referring in a general way to elements of this sort—we use generic wording, most often "nonconsent."

the jury affirmatively found, with respect to the charge of second-degree sexual abuse, that, when defendant subjected the victim to sexual intercourse, he had not *known* that the victim had not consented thereto. Over defendant's continuing objection that he could not be found guilty of second-degree sexual abuse in the absence of a finding that he knew that the victim did not consent, the trial court entered a judgment of conviction and sentence on the second-degree sexual abuse charge.

Defendant appealed, arguing that the trial court had committed reversible error when it instructed the jury on the second-degree sexual abuse charge and entered a judgment of conviction on that charge in the absence of a jury finding that defendant had known that the victim did not consent. Defendant argued that, by analogy to *Simonov*, the victim's nonconsent was a "conduct" element that, in the absence of any specification in the statute as to which mental state applied, required proof that he had known at the time that the victim did not consent to sexual intercourse. In a brief per curiam opinion, the Court of Appeals affirmed. *State v. Haltom*, 298 Or App 533, 447 P3d 66 (2019). It held that the outcome was controlled by its own decision in a case that preceded *Simonov*—*State v. Wier*, 260 Or App 341, 317 P3d 330 (2013). *Wier* held that, in the statute that defines *third*-degree sexual abuse (subjecting another person to "sexual contact" when the person "does not consent"), the victim's nonconsent is a "circumstance" element for which, in the absence of any specification of mental state, proof of knowledge, recklessness, or even criminal negligence all would suffice for conviction. *Wier*, 260 Or App at 351-53. Although defendant had argued to the Court of Appeals that *Wier* did not survive this court's decision in *Simonov*, the court disagreed, noting that *Simonov* had neither overruled *Wier* nor employed an analysis that demonstrated that *Wier* was "plainly wrong." *Haltom*, 298 Or App at 535. One judge opined in a concurrence that, in light of *Simonov*, *Wier* was wrong but not "plainly wrong"—the rigorous standard used by the Court of Appeals in deciding whether to overrule one of its own prior cases. *Id.* at 535-41 (Aoyagi, J., concurring). The concurring judge therefore agreed with the majority that *Wier*—which involved a statute that is closely related

to the second-degree sexual abuse statute at issue in the case—controlled the Court of Appeals decision. *Id.*

Defendant sought review of the Court of Appeals decision in this court, and we allowed review to consider how the principles described in *Simonov* apply to the second-degree sexual abuse statute.

## II.  ANALYSIS

### A.  Simonov

The natural starting point is a more illuminating description of *Simonov*, 358 Or 531. As noted, *Simonov* was concerned with the UUV statute, ORS 164.135(1)(a), which makes it a felony to "take[], operate[], exercise[] control over, ride[] in or otherwise use[] another's vehicle \* \* \* *without consent of the owner.*" (Emphasis added.) The defendant in *Simonov* had been convicted of UUV based on evidence showing that both he and his brother had used a neighbor's borrowed truck in a manner that far exceeded the scope of the neighbor's permission, but also showing that the defendant may not have been aware of the limited scope of the neighbor's permission. At trial, the defendant had argued for an instruction that, to convict, the jury must find that he had known that the use of the truck was without the owner's consent, but the trial court had instead instructed the jury that it also could convict if it found that the defendant was reckless or criminally negligent with respect to the "without consent" element. After the defendant was convicted based on those instructions, he appealed, arguing that the jury instructions were incorrect. The Court of Appeals agreed with the defendant and reversed, and the state sought review.

This court began its analysis by setting out certain "core principles" that are useful in any effort to determine what mental state attaches to an element of a crime. These core principles include that: (1) the statute that defines an offense, read in the context of the Oregon Criminal Code's general culpability provisions, determines the applicable mental state or states; (2) under ORS 161.095(2), a culpable mental state is required for each element of the offense except for those relating to the statute of limitations,

jurisdiction, venue, and the like;[5] (3) under ORS 161.115(2), if a statute does not prescribe a culpable mental state, culpability is established only if it is shown that the person had one of the four culpable mental states enumerated and defined in the general culpability provisions—intentionally, knowingly, recklessly, or with criminal negligence; (4) under the statutory definitions of those four culpable mental states, certain mental states apply to only certain categories of elements, *i.e.*, "conduct" elements, "circumstance" elements, and "result" elements;[6] (5) knowledge is the minimum culpable mental state for conduct elements, while criminal negligence is the minimum culpable mental state

---

[5] ORS 161.095(2) provides, "Except as provided in ORS 161.105, a person is not guilty of an offense unless the person acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

[6] The four culpable mental states are defined at ORS 161.085(7)-(10):

"(7) 'Intentionally' or 'with intent,' *when used with respect to a result or to conduct* described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described.

"(8) 'Knowingly' or 'with knowledge,' *when used with respect to conduct or to a circumstance* described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists.

"(9) 'Recklessly,' *when used with respect to a result or to a circumstance* described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

"(10) 'Criminal negligence' or 'criminally negligent,' *when used with respect to a result or to a circumstance* described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

(Emphases added.) As this court observed in *State v. Crosby*, 342 Or 419, 428, 154 P3d 97 (2007), those definitions

"refer to three different types of material element: a conduct, a circumstance, or a result. In Oregon, each mental state relates to two of the three categories. *See* ORS 161.085(7) ('intentionally' involves mental state as to conduct or result, but not circumstance); ORS 161.085(8) ('knowingly' involves mental state as to conduct or circumstance, but not result); ORS 161.085(9) ('recklessly' involves mental state as to result or circumstance, but not conduct); ORS 161.085(10) ('criminal negligence' involves mental state as to result or circumstance, but not conduct)."

for both circumstance and result elements; and (6) thus, any effort to determine the minimum culpable mental state for a particular material element of an offense requires an initial determination of the category—conduct, circumstance, or result—under which the material element falls. *Simonov*, 358 Or at 537-40.

Based on those core principles, this court in *Simonov* concluded that the dispositive issue was whether the "without consent" element of the UUV statute was "part of the conduct proscribed by the offense or whether it [was] a circumstance." *Id.* at 540. To answer that question, it was necessary for the court to determine what the legislature understood to be included in "conduct." Noting that "conduct" is defined, for purposes of the general culpability statutes, as "an act or omission *and its accompanying mental state*," ORS 161.085(4) (emphasis added),[7] the court opined that the applicable mental state necessarily informs and shapes the meaning of "conduct." And given that the "knowing" mental state—the minimum mental state for a conduct element—is defined at ORS 161.085(8) to mean that "a person acts with an awareness that the conduct of the person is of a nature so described" and that "nature" is commonly understood to refer to "the essential character or constitution of something," the court determined that the mental state definitions at ORS 161.085(7) to (10) "that apply to 'conduct' *** do not merely apply to a particular bodily movement; they also more broadly apply to other elements that describe the nature, that is, the essential character, of the prohibited act." 358 Or at 540-41. Thus, the court concluded, "conduct" elements are those that describe the "nature or essential character of the defendant's act or omission" or, in other words, that "make the defendant's own act or omission of a described nature." *Id.* at 541, 544. "Circumstance elements," in contrast, are "facts that attend or accompany the defendant's conduct," *id.* at 544, and "do[] not change the essential character of the prohibited conduct," *id.* at 542.

The court then turned to the statute defining the crime of UUV to determine whether, in enacting it, the

---

[7] For the purposes of that definition of conduct, an "act" is a "bodily movement." ORS 161.085(1).

legislature had understood the "without consent" element to be "part of the nature or essential character of the act proscribed [therein]," *i.e.*, conduct. *Id.* at 546-48. Applying the interpretive framework set out in *PGE v. Bureau of Labor and Industries*, 331 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), the court focused on text and context. It found the grammatical role of the "without consent" element within the definition of UUV to be relevant: The fact that it was cast as an adverbial phrase modifying the relevant bodily movement—"rides"— suggested that the legislature viewed lack of consent as part of the conduct that was proscribed. *Id.* at 547. The court contrasted that adverbial usage with different grammatical constructions that might suggest a different intent:

> "[The legislature] could have described particular acts and then, in a series of separately numbered provisions, it could have described the circumstance elements attendant to those acts. Even separating the owner's lack of consent from the verb in independent clauses arguably could have signaled a legislative intent to create an independent circumstance element."

*Id.* In a footnote, the court pointed to the third-degree sexual abuse statute, ORS 163.415, as an example of one of those different grammatical constructions that would support an understanding that the nonconsent element therein was intended as a "circumstance" element, and it noted that in *Wier*, the Court of Appeals had concluded that, in that context, the minimum mental state that attached to the element was "criminal negligence." *Id.* at 547 n 5. The court expressly noted, however, that the proper construction of ORS 163.415 and the correctness of *Wier* was not at issue. *Id.*

The court in *Simonov* also observed that the fact that UUV is punishable as a felony seemed incompatible with application of a criminal negligence mental state to the "without consent" element, given that a passenger who rides in a vehicle, naively trusting that the owner had consented to its use, would be subject to such a severe consequence. *Id.* at 548. Finally, the court suggested that it was all but "axiomatic" that the essential nature of the act that the UUV statute criminalizes is not mere use of a vehicle but

use of a vehicle without permission. *Id.* Based on the foregoing textual and contextual clues, the court concluded that, in the UUV statute, the owner's lack of consent is part of the proscribed conduct and requires at least a "knowing" mental state. *Id.*

B.   *The Parties' Positions*

In their arguments to this court, the parties share some common ground. They agree that *Simonov* provides the relevant analytical framework for determining the minimum mental state that attaches to the "does not consent" element in ORS 163.425(1)(a) and they both accept the "core principles" upon which the analysis in *Simonov* relies—most notably that, assuming there is no express specification of the required mental state, "knowing" is the minimum mental state that must be proved for a "conduct" element of an offense and "criminally negligent" is the minimum mental state that must be proven for a "circumstance" element. They also appear to agree, consistently with *Simonov*, that whether an element is a conduct element requiring proof of at least a knowing mental state is a matter of legislative intent. *See Simonov*, 358 Or at 546 ("The determination whether a particular element of an offense within the Criminal Code requires a culpable mental state and, if so, what mental state is required, ultimately is a matter of legislative intent.").

The parties part ways, however, over the significance and effect of certain discussions in *Simonov*, including the extent to which the use of one of the alternative grammatical constructions examined in the case is dispositive. The parties also differ in the conclusions that they draw from the legislative history of ORS 163.425 and the general culpability statutes.

C.   *Legislative intent with respect to what?*

As noted, this court in *Simonov* stated that the question of what mental state attaches to a particular element of an offense when none is specified is a matter of legislative intent. But, given the context in which that statement appears, it is not entirely clear what *Simonov* proposes as the object of that inquiry. On the one hand, *Simonov* adverts

to a default rule whereby, in the absence of any specification of the required mental state in a statute defining a criminal offense, any one of three mental states—criminal negligence, recklessness, or knowledge—will suffice with respect to a "circumstance" element, while, for a "conduct" element, either knowledge or intention is required. 358 Or at 539-40. In keeping with that default rule, the court in *Simonov* looked for clues as to whether the legislature understood the element of the owner's nonconsent to the defendant's use of a vehicle to be "conduct" or a "circumstance"—specifically remarking on the grammatical connection between the use and the nonconsent and the self-evident role of the owner's nonconsent in the essential character of the conduct that the UUV statute proscribed.

On the other hand, the court seemed to incline toward a direct inquiry into what mental state the legislature intended to attach to the element under consideration when it suggested that the legislature would not have wished to impose the severe consequence of felony liability on a defendant who was merely criminally negligent with respect to the owner's nonconsent. The latter approach is not entirely compatible with the idea that a default rule fills in when a criminal statute fails to specify the applicable mental state or states. Although *Simonov* may have been attempting to bridge the gap when it characterized the default rule as a useful "guideline[]," 358 Or at 546, the attempt is not entirely successful, given that *Simonov* provides no explanation for thus downgrading what it initially presented as a categorical rule drawn from the general culpability statutes.

In those circumstances, we think that it is reasonable to initially focus on whether the legislature that enacted the statute intended or understood the element at issue as a circumstance or as part of the conduct that the statute proscribes. Focusing on that issue honors the default rule that is at the heart of the *Simonov* analysis. Evidence directed at determining which mental state the legislature might have intended to attach to the element at issue should then be considered to confirm or rebut any tentative conclusion reached under the default rule analysis.

D. *What did the legislature intend? Conduct versus circumstance.*

To determine whether, in enacting the second-degree abuse statute, ORS 163.425, the legislature understood and intended the victim's nonconsent as part of the conduct that required proof of at least a knowing mental state, or instead, as a circumstance requiring proof of a lesser mental state, *i.e.*, criminal negligence, we consider the statutory text and context and any helpful legislative history. *Gaines*, 346 Or at 171-72. In its entirety, ORS 163.425 provides:

"(1)   A person commits the crime of sexual abuse in the second degree when:

"(a)   The person subjects another person to sexual intercourse, oral or anal sexual intercourse or, except as provided in ORS 163.412, penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor *and the victim does not consent thereto*; or

"(b)(A)   The person violates ORS 163.415(1)(a)(B);

"(B)   The person is 21 years of age or older; and

"(C)   At any time before the commission of the offense, the person was the victim's coach as defined in ORS 163.426.

"(2)   Sexual abuse in the second degree is a Class C felony."

(Emphasis added.) Paragraph (1)(a) is the part of the statute that applies here. The text itself presents this question: Did the legislature consider the emphasized phrase "and the victim does not consent thereto" to be part of the essential character of a prohibited act—subjecting a nonconsenting person to sexual intercourse, etc.—or merely a circumstance that attends the conduct, which is the sexual intercourse itself?

1.   *The role of the "does not consent" element*

Proceeding to context, we begin with what we see as the most important factor featured in the *Simonov* decision—the apparent role of the element under consideration vis-à-vis the central conduct element. Here, defendant

contends that the victim's nonconsent is self-evidently part of the essential character of the conduct that ORS 163.425(1)(a) proscribes. Defendant observes, in that regard, that the act or bodily movement that ORS 163.425(1)(a) requires—sexual intercourse (or some other specified sexual act)—is ordinarily considered natural and mutually desirable and is made criminal only when the other person does not consent. Thus, defendant contends, the "does not consent" requirement is not merely *attendant* to the sexual conduct that is proscribed in ORS 163.425(1)(a), in the way that, for example, the value of stolen property is attendant to the prohibited conduct for theft, thereby increasing the degree of theft that applies but not the essential character of the proscribed conduct. *See Simonov*, 358 Or at 541 (so explaining). Rather, defendant argues, nonconsent changes the essential nature of the specified forms of sexual conduct, which would otherwise be legal, thereby becoming an integral part of the conduct that the statute proscribes. Accordingly, defendant concludes, the nonconsent of the victim plays the same role in the sexual abuse statute that, according to *Simonov*, the owner's nonconsent plays in the UUV statute—meaning that that element is a conduct element for which a minimum mental state of knowledge must be proved.

Defendant's argument faithfully reflects the reasoning that led this court to declare, in *Simonov*, that it "border[ed] on the axiomatic" that the lack of consent element of the UUV statute was part of the conduct that was proscribed. 358 Or at 548. And we find that reasoning even more compelling when applied to the second-degree sexual abuse statute. It is significant, in that regard, that the central conduct element in ORS 163.425(1)(a) is worded in terms of "subject[ing] another person to sexual intercourse." The ordinary meaning of the verb "subject," as relevant in this context, is "1 a: to bring under control or dominion : SUBJUGATE \*\*\* b: to reduce to subservience or submission : make (as oneself) amenable to the discipline and control of a superior \*\*\* 4: to cause to undergo or submit to : make submit to a particular action or effect : EXPOSE." *Webster's Third New Int'l Dictionary* 2275 (unabridged ed 2002). "Subject[ing]" another person to a sexual act thus conveys that the sexual act is imposed on a person who merely

submits to the imposition. The wording thus carries at least an implication of unwillingness on the part of the other person—which implication is clarified and confirmed by the requirement in ORS 163.425(1)(a) that "the victim does not consent." Thus, the "subjects to" wording of the statute's central conduct element strongly supports defendant's contention that the "does not consent" element is an integral part of the conduct that the statute proscribes.

> 2.   *The grammatical construction of the "does not consent" element*

The state argues, however, that the grammatical construction of the "does not consent" element in ORS 163.425(1)(a) undermines defendant's contention. The state seizes upon the fact that, in contrast to the adverbial presentation of the "without consent" wording in the UUV statute analyzed in *Simonov*, the "does not consent" wording in ORS 163.425(1)(a) appears as an independent clause. The state argues that, under *Simonov*, the legislature's choice to separate the nonconsent phrase from the relevant verb ("subjects *** to sexual intercourse") as an independent clause signals an intent to treat a victim's nonconsent as an independent circumstance requiring the lesser "criminal negligence" mental state. In fact, the state argues, that legislative choice is all but dispositive, because it leaves no textual hook upon which to hang the idea of nonconsent as part of the proscribed act. The state insists, in that regard, that the decision in *Simonov* ultimately was driven by the court's point about the grammatical structure of the statutory text, based on the principle that any inquiry into a statute's meaning must be rooted in the statute's text.

Relatedly, the state points to the discussion of the third-degree sexual abuse statute, ORS 163.415, in *Simonov*. That discussion, which appears in a footnote, (1) identified paragraph (1)(a) of ORS 163.415 as an example of a grammatical structure that separates the "does not consent" phrasing from the relevant proscribed act (subjecting another to sexual contact);[8] and (2) expressly noted that, in

---

[8]  Paragraph (1)(a) of ORS 163.415 provides, in relevant part:

   "(1)  A person commits the crime of sexual abuse in the third degree if:

*Wier*, 260 Or App at 354, the Court of Appeals held that, to convict a defendant of third-degree sexual abuse under ORS 163.415, the state need only show that the defendant was criminally negligent with respect to the victim's lack of consent. *Simonov*, 358 Or at 547 n 5. The state contends that, by including that discussion, this court in *Simonov* all but confirmed that, in ORS 163.415 and other, related statutes that define sexual abuse in terms of the victim's nonconsent to the perpetrator's sexual acts without joining those two elements by means of an adverbial construction, the victim's nonconsent is merely an attendant circumstance and requires only a criminally negligent mental state. Thus, the state concludes, *Simonov* conclusively answered the question that defendant poses here, obviating any need for further examination of the legislature's intent.

The rule that the state purports to draw from *Simonov*, quite simply, is not there. The basic message of *Simonov* is that, ultimately, whether an element such as the victim's lack of consent should be considered part of the proscribed conduct (and thus as requiring a knowing mental state) is a matter of legislative intent, to be resolved using the usual analytical framework. The use of a particular grammatical construction may lend support to one side of an interpretive controversy, but it is in no sense the whole ball game. As with any inquiry into a statute's meaning, the final determination as to the legislature's intent must be based on an analysis of *all* the relevant textual, contextual, and historical evidence that is available.

Neither does *Simonov*'s brief mention of ORS 163.415(1)(a) and the Court of Appeals' construction of that statute in *Wier* resolve the question in the state's favor. The footnote in *Simonov* merely identified ORS 163.415(1)(a) as an example of a different grammatical construction that might suggest a different legislative intent, *i.e.*, that the nonconsent element be treated as a circumstance, requiring a minimum mental state of criminal negligence. *See Simonov*, 358

"(a)  The person subjects another person to sexual contact and:

"(A)  The victim does not consent to the sexual contact; or

"(B)  The victim is incapable of consent by reason of being under 18 years of age."

Or at 547 n 5. And while the *Simonov* footnote did include an observation that, in *Wier*, the Court of Appeals had concluded that the third-degree sexual abuse statute's "does not consent" element is a circumstance, requiring only proof of criminal negligence, it also clearly conveyed that this court, in *Simonov*, was not deciding whether that conclusion was correct. *Id.*

Finally, we must acknowledge that *Simonov* may have given greater prominence than was warranted to the legislature's use of a particular grammatical construction to convey the nonconsent element in the statute at issue in that case. While we continue to recognize that the legislature's choice of one grammatical construction over another to convey a material element of a crime *may* be suggestive of its understanding of the typology of that element, the diagnostic value of the choice between the two grammatical constructions discussed in *Simonov*—and at issue here—is fairly weak. In ordinary parlance, the adverbial "without consent" construction and the independent "does not consent" construction are used interchangeably, which makes it less likely that there was anything purposive or meaningful in the legislature's choice to use one construction rather than the other. Indeed, in the closely related *third*-degree sexual abuse statute, ORS 163.415, set out below, 366 Or at 808, paragraph (1)(a) uses the "does not consent" construction while the very next paragraph, (1)(b), uses the "without the consent" construction, without any apparent intent or reason to treat the one as a circumstance and the other as part of conduct, in the particular contexts in which the two constructions appear. Accordingly, we conclude that the fact that the nonconsent element in ORS 164.425(1)(a) appears as an independent clause, as opposed to an adverbial one, is not helpful in determining whether the legislature viewed that element as a circumstance or part of the proscribed conduct.

  3.  *The similar "does not consent" wording in ORS 163.415*

The state also argues that the notion that the "does not consent" requirement is part of the conduct proscribed by ORS 163.425(1)(a) is undermined by the fact that the

same "does not consent" wording appears in a closely related statute just mentioned, ORS 163.415, and decidedly is a circumstance, not conduct, in that context. As noted, ORS 163.415 defines *third*-degree sexual abuse, a misdemeanor. It provides, in part:

"(1)  A person commits the crime of sexual abuse in the third degree if:

"(a)  The person subjects another person to sexual contact and:

"(A)  The victim does not consent to the sexual contact; or

"(B)  The victim is incapable of consent by reason of being under 18 years of age; or

"(b)  For the purpose of arousing or gratifying the sexual desire of the person or another person, the person intentionally propels any dangerous substance at a victim without the consent of the victim."

Subsection (1)(a), the state notes, uses the same "subjects another person to" wording as the second-degree sexual abuse statute, ORS 163.425(1)(a), except that it substitutes "sexual contact" for the string of more specific sexual acts in the latter statute, and also uses the same "and the victim does not consent" wording. The legislature enacted ORS 163.415 as part of the 1971 Criminal Code revision; later, in 1983, it enacted the provision of the second-degree sexual abuse statute, ORS 163.425(1)(a), at issue in this case.

The state contends that, in light of the present statute's nearly identical wording to the "does not consent" wording in ORS 163.415(1)(a), we must assume that the legislature's intent with respect to the role of the "does not consent" wording was the same. Accordingly, the state argues, if it can be clearly established that the legislature that enacted ORS 163.415(1)(a) intended the "does not consent" requirement as a circumstance element to which a minimum mental state of criminal negligence would attach, that same legislative intent carries over to ORS 163.425(1)(a).

The state advances two arguments that, in its view, show what the legislature intended with respect to ORS 163.415(1). We already have considered and rejected

one of those arguments—that, in *Simonov*, this court gave its blessing to the Court of Appeals' holding in *Wier* that the "does not consent" element in ORS 163.415(1)(a) is a circumstance that requires only a criminally negligent mental state. As explained above, any vague sense of approval that might be gleaned from this court's mention of *Wier* in *Simonov* is overshadowed by the express declaration that the issue in *Wier* need not be decided.

The state's second argument about ORS 163.415(1)(a) focuses on that statute's "legislative history," in the broadest sense of that term. ORS 163.415(1) was enacted as part of the 1971 Criminal Code, which initially was adopted by the Criminal Law Revision Commission after a years-long drafting process, and later was submitted to the legislature with a recommendation that the draft be enacted. In light of that history, this court generally treats the Commission's records of its proceedings and its commentary on the draft code as indicative of the legislature's intent. *See State v. Carpenter*, 365 Or 488, 497 n 4, 446 P3d 1273 (2019) ("When evaluating statutes developed by the Criminal Law Revision Commission, we look to both the commentary and the discussions that preceded the adoption of the final draft as legislative history for the resulting laws.").

In its argument to this court regarding the legislature's intent respecting ORS 163.415(1)(a), the state notably does not turn to the proceedings and commentary that relate to that statute itself; instead, it cites a subcommittee discussion about an early draft of the general Criminal Code provisions pertaining to culpability. In that discussion, one of the draft authors, Professor Arthur, in discussing the "material elements" of a crime and using rape as an example, characterized a victim's nonconsent to sexual intercourse in that crime as an "attendant circumstance." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1 (statement of Courtney Arthur). Much as the Court of Appeals did in *Wier*, 260 Or App at 336, the state cites Professor Arthur's statement as more or less conclusive evidence that, in enacting the 1971 Criminal Code, the legislature understood the nonconsent requirement of the offense now codified at ORS 163.415(1)(a) as a "circumstance" element.

But Professor Arthur's statement cannot support the weight that the state assigns to it. First, that statement was not directed at the statute now codified at ORS 163.415(1)(a)—or at any other statute or draft that was then under consideration. Rather, it was a comment about the general (perhaps common law) concept of rape, made in the context of a discussion about general liability principles as addressed in the Model Penal Code. *Id.* That problem aside, the interpretive value of Professor Arthur's comment is significantly undercut by the fact that it met with considerable resistance from some members of the subcommittee and that the subcommittee ultimately did not resolve whether the victim's nonconsent was a circumstance or part of the conduct.[9]

In sum, we do not find that the legislative history on which the state relies supports its contention that the 1971 Legislative Assembly understood and intended the

---

[9] One member of the subcommittee, Spaulding, repeatedly and strenuously insisted that lack of consent was *not* an attendant circumstance and that the "conduct you're talking about is sexual intercourse without the consent of the female." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1 (statement of Bruce Spaulding). Professor Arthur then explained:

"No *** I believe the conduct is simply the act of intercourse. Which is the same basically regardless of whether one is married, whether there's consent or not. The conduct is the same, but the circumstances are different."

*Id.* (statement of Courtney Arthur). Another participant, Paillette, then interjected: "Let's talk about forcible rape. Force. The element of force *** separates this and makes this a different act. Doesn't it?" When Professor Arthur responded that force was part of the conduct, Paillette repeated that "that makes it a different act than voluntary sexual intercourse between a man and his wife." *Id.* Ultimately, other members of the subcommittee joined in, but, as the meeting minutes reflect, the subcommittee did not resolve the question:

"There followed a lengthy discussion concerning the meaning of the term 'attendant circumstance.' Attendant circumstance was applied to hypothetical situations involving statutory rape, burglary and robbery but members were unable to agree precisely on what the term was intended to cover or to articulate a clear-cut distinction between attendant circumstance and conduct."

Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968. In the end, however, Paillette suggested that if the culpability statutes were amended to provide that the state must prove one of the four defined mental states for each "material element" of the crime, drawing a clear distinction between an attendant circumstance and conduct would not be necessary. *Id.* The subcommittee seemed to accept that solution (it unanimously adopted the proposed amendment), which avoided, rather than resolved the dispute.

nonconsent requirement in ORS 163.415(1)(a) as a circumstance element. And, in the absence of any clear indication that the victim's nonconsent is a circumstance element in the context of ORS 163.415(1)(a), the assumption that the 1983 Legislative Assembly intended the nonconsent requirement in ORS 163.425(1)(a) to have the same role and meaning that it has in ORS 163.415(1)(a) does not advance the state's position that, in ORS 163.425(1)(a), that requirement is a circumstance rather than conduct.

### 4.   *Initial determination: Conduct*

As noted above, the initial focus in the present case is on determining whether the legislature that enacted ORS 163.425(1)(a) intended and understood the requirement in that statute that "the victim does not consent" as a circumstance element or, instead, as an essential part of the conduct that the statute proscribes. Based solely on the arguments and evidence that pertain to *that* question (as opposed to the question of which mental state the legislature likely intended to attach to the requirement), it appears that the legislature conceived of the victim's nonconsent as an integral part of the proscribed conduct. Particularly in light of the phrasing of the central conduct element—the person "*subjects* another person to sexual intercourse"—it is evident that the conduct that the legislature intended to proscribe is *nonconsensual* sexual intercourse and that the requirement that the victim "does not consent" is an essential aspect of that conduct. The use of almost identical wording in the third-degree sexual abuse statute, ORS 163.415(1)(a), does not detract in any way from that conclusion, given that the state has failed to show that, in the context of that statute, the legislature intended the "does not consent" requirement to be a circumstance. Neither does the legislature's choice to convey the requirement in an independent clause rather than an adverbial phrase contradict its essential role in the proscribed conduct.

### E.   *What did the legislature intend? "Knowingly" versus "criminally negligent"*

Having thus reached a tentative conclusion that the nonconsent requirement in ORS 163.415(1)(a) is a conduct element for purposes of the default rule requiring a

minimum mental state of "knowingly" for conduct elements and a minimum mental state of "with criminal negligence" for circumstance elements (assuming that no mental state is specified in the statute), we turn to the arguments that might confirm or undermine that conclusion by showing that the legislature either did or did not intend a knowing mental state to attach to the requirement.

1.   *The severity of felony liability*

We first consider an argument by the state that draws on, but seeks to distinguish, a factor on which this court relied in analyzing the nonconsent element of the UUV offense at issue in *Simonov*. In *Simonov*, we were persuaded that that nonconsent element was "conduct" requiring proof of a knowing mental state in part by the fact that UUV is punishable as a felony, a result that seemed too severe for a crime that could be committed through mere criminal negligence:

> "Under [an] interpretation [that treats the owner's non-consent as a 'circumstance' element to which a minimum mental state of criminal negligence would attach], naïve trust could subject a person to criminal liability for a felony. ORS 164.135(2). The severity of that consequence suggests that the legislature did not contemplate that mere criminal negligence would suffice to establish criminal liability for UUV."

358 Or at 548. The state contends that, although the second-degree sexual abuse statute also imposes felony liability, that reasoning from *Simonov* would not support the same conclusion with regard to application of a criminally negligent mental state to the second-degree sexual abuse statute's "does not consent" element. That is so, the state argues, because second-degree sexual abuse is "fundamentally different" from UUV in a number of ways that make a lower culpable mental state appropriate. First, the state argues, a "knowing" mental state is inherent in the very concept of UUV, *i.e.*, "joyriding," while the same cannot be said about nonconsensual sexual intercourse or sexual contact. Second, subjecting a person to sexual intercourse without their consent causes significantly greater, and more lasting, harm than occurs when a person uses a car without the owner's

permission. Third, the circumstance of close physical contact in which second-degree sexual abuse occurs make it easy to determine whether the other person is consenting to the sexual contact, which is not always the case in the UUV context, where the person whose permission is required often is not present or within easy reach. Fourth, there is simply a higher level of moral opprobrium that attaches to unconsented sexual contact than to unconsented use of a vehicle. And finally, the state asserts, proving a defendant's knowledge of the victim's nonconsent to sexual contact is significantly more difficult than proving a defendant's knowledge of a vehicle owner's nonconsent to the vehicle's use, and would effectively shift the burden of proof on the issue to the victim, requiring the state to show that the victim had physically and verbally resisted. For all those reasons, the state concludes, it is easy to see why the legislature would impose felony liability on a sexual abuser who did not know, but did not make it his or her business to know, whether the person he or she was subjecting to sexual intercourse had consented to the act.

The state's first argument is based on a premise that is simply incorrect—that a "knowing" mental state inheres in the very concept of "joyriding." While, for the reasons explained in *Simonov*, the *law* requires proof that a joyrider actually knew of the car owner's nonconsent before he or she may be convicted of UUV, a person clearly can engage in what is *commonly understood* as "joyriding" without actual knowledge of that nonconsent.

As to the state's remaining arguments, they ascribe views about sexual crimes to the 1983 legislature that, in all probability, were not ascendant. Now, nearly forty years after ORS 163.425(1)(a) was enacted, it may seem obvious that a person who submits to unwanted sex may suffer significant and lasting harm and that a person who pushes sex on an unwilling partner is especially blameworthy, even in the absence of actual or threatened physical violence. But, in 1983, those ideas had only started to gain traction among legal theorists and were still a subject of debate. *See, e.g.*, Susan Estrich, *Rape*, 95 Yale L J 1087, 1121-32 (1986); Christina M. Tchen, *Rape Reform and a Statutory Consent*

*Defense*, 74 J Crim L & Criminology 1518, 1522-25, 1533-37 (1983); Leigh Bienen, *Rape III - National Developments in Rape Reform Legislation*, 6 Women's Rts L Rep 170, 180-84 (1980). Moreover, in relying on the idea that it is easier to ascertain whether a person does not consent in the sexual abuse context than in the UUV context, the state fails to confront the continuing state of confusion and controversy that, even to this day, surrounds the question of what, legally, constitutes sexual consent. *See* Michal Buchhandler-Raphael, *The Failure of Consent: Reconceptualizing Rape as Sexual Abuse of Power*, 18 Mich J Gender & L 147, 159 (2011) ("Acknowledging that the concept of consent itself is highly contested, not only when viewed through a practical legal lens but also from a theoretical-philosophical viewpoint, reformers have turned their endeavors to practical solutions."); Peter Westen, *Some Common Confusions about Consent in Rape Cases*, 2 Ohio St J Crim L 333, 340-42 (2004) (although law predicates liability for rape on victim's lack of consent, there is no common concept of consent or nonconsent).

Moreover, even if the legislature reasonably *could* have concluded that felony liability was warranted for a sexual abuser who is merely negligent with respect to the victim's nonconsent, that is not the same as believing that the 1983 Legislative Assembly *did* so conclude. The state's reasoning thus does not constitute the kind of affirmative evidence of a legislative intent with respect to mental state that might dissuade us from our preliminary conclusion, above, that the "does not consent" requirement of ORS 163.425(1)(a) is a conduct element (which, in the absence of any specification of mental state, would require proof of the defendant's knowledge).

2.  *ORS 163.325*

The state points to ORS 163.325 as additional context supporting its position that the legislature did not intend that a knowing mental state attach to the "does not consent" requirement in ORS 163.425(1)(a). ORS 163.325 provides:

"(1)   In any prosecution under ORS 163.355 to 163.445 in which the criminality of conduct depends on a child's

being under the age of 16, it is no defense that the defendant did not know the child's age or that the defendant reasonably believed the child to be older than the age of 16.

"(2) When criminality depends on the child's being under a specified age other than 16, it is an affirmative defense for the defendant to prove that the defendant reasonably believed the child to be above the specified age at the time of the alleged offense.

"(3) In any prosecution under ORS 163.355 to 163.445 in which the victim's lack of consent is based solely upon the incapacity of the victim to consent because the victim is mentally defective, mentally incapacitated or physically helpless, it is an affirmative defense for the defendant to prove that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent."

Under defendant's theory of ORS 163.425(1), the state observes, the victim's nonconsent is part of the proscribed conduct to which a minimum mental state of knowledge attaches, meaning that the state must bear the burden of proving that the defendant knew that the victim did not consent—including, when relevant, that the defendant knew that the victim was mentally or physically *incapable* of consenting. However, the state notes, subsection (3) of ORS 163.325 expressly makes the defendant's *lack* of knowledge of the victim's incapacity to consent an *affirmative defense*, meaning that the defendant must bear the burden of proof on the issue. In the state's view, defendant's theory is incompatible with ORS 163.325(3). The state also contends that, by providing a lack-of-knowledge defense with respect to the victim's mental or physical *incapacity* to consent without simultaneously providing such a defense with respect to the victim's *actual* nonconsent, ORS 163.325 strongly suggests that the legislature did not intend that a defendant's lack of knowledge of a victim's *actual* nonconsent would stand as a bar to conviction—either as an affirmative defense or as part of the state's evidentiary burden.

Defendant counters, however, that ORS 163.325 actually supports his position that the legislature intended a knowing mental state to attach to the "does not consent" element of ORS 163.425(1)(a). He argues, specifically, that,

in providing affirmative defenses to sex crimes based on the defendant's lack of knowledge of the victim's nonconsent only when the victim is legally, mentally, or physically *incapable* of consenting, the statute confirms that the *general* rule that applies in sex crimes is that the state bears the burden of proving the defendant's knowledge of the victim's nonconsent. Defendant contends that that general rule follows as a matter of logic, but he also purports to find support for it in the commentary pertaining to the section of the Criminal Law Revision Commission's final draft of the 1971 Criminal Code that was enacted and codified as ORS 163.325. With respect to the affirmative defense of mistake as to the victim's incapacity to consent, ORS 163.325(3), defendant points to a statement in the commentary that follows a description of the defendant's evidentiary burden: "The defendant is given the opportunity to exculpate himself *but the state is not given the difficult burden of proving culpable knowledge.*" Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 106, 108 (July 1970) (emphasis added). With respect to the affirmative defense of mistake as to the victim's age, ORS 163.325(2), defendant points to commentary explaining that, until the California Supreme Court decided to the contrary in a 1964 case, *People v. Hernandez*, 61 Cal 2d 529, 393 P2d 673 (1964), it was "universally accepted" that a defendant's "knowledge" of the victim's age was not a required element of the crime of statutory rape, and that the Oregon Criminal Code would follow *Hernandez*—and depart from "the great weight of authority before *Hernandez*"—by providing a defense of mistake of fact as to the victim's age. Commentary § 106 at 108-09. With respect to the pre-*Hernandez* rule, defendant notes, the commentary states:

> "The rule that knowledge of the victim's age is not an essential element of the crime of statutory rape and therefore justifiable ignorance of age is not a defense in prosecution for that crime *is apparently an exception to the general rule that guilt attaches only where the accused intended to do the prohibited act.*"

*Id*. (Emphasis added.)

Defendant argues that those comments, taken together, show that the legislature understood the common

law regarding sex crimes historically had imposed strict liability with respect to a victim's lack of consent when the victim is a minor or physically or mentally disabled or incapacitated, such that, in those instances, the state need prove only that the victim in fact was disabled or incapacitated or below the age of consent and need *not* prove anything about the defendant's mental state as to those conditions. But, defendant argues, the commentary also shows that the legislature limited that strict liability approach to particular sex crimes against a specified group of vulnerable victims, effectively carving out an exception to the "general rule" regarding sex crimes—that the state must prove that the defendant *knew* that the victim in fact did not consent. Thus, defendant argues, while ORS 163.325 provides affirmative mistake-of-fact defenses that are specific to the categories of cases for which a defendant ordinarily would be strictly liable (based on the victim's age or incapacity to consent), it does not speak to—and therefore leaves intact—the general rule for sex crimes that do not fall within those exceptional categories. Accordingly, defendant concludes, there is no inconsistency in providing affirmative mistake-of-fact *defenses* for sex crimes involving certain categories of victims who are deemed incapable of consenting and requiring the state to bear the burden of proving the defendant's actual knowledge of the victim's *actual* nonconsent when the victim is *not* in one of those categories. Neither, he argues, does the legislature's failure to provide a similar mistake-of-fact defense for cases of actual nonconsent suggest a legislative intent to apply a less culpable mental state than knowledge in those cases.

In making that argument, defendant assumes that when the commentary alludes to the historical strict liability approach to the legally implied nonconsent of underage victims in sex crime cases and describes that approach as an exception to the "general rule," it necessarily is also conveying that the strict liability approach has *not* been applied to an "ordinary" victim's nonconsent and that those "ordinary" nonconsent cases fall under the "general rule." In light of the following paragraph in the same section of commentary, that assumption may not be warranted:

> "Section 106 also covers mistake as to consent. There are no reported cases in Oregon ruling on the availability of such a defense in prosecutions for rape. *However, it would appear that if in fact there was no consent, the crime would be committed.* Also, there are no reported cases on the availability of such a defense in prosecutions for sodomy; however, since consent is not a defense to sodomy, it would appear that mistake as to consent would not provide a defense."

Commentary § 106 at 108 (emphasis added). That paragraph *could* be read as stating that the mistake-of-fact provisions were being adopted against a legal landscape in which no mental state requirement attached to the element of nonconsent in *any* of its forms—and that reading would conflict with defendant's claim that, historically, strict liability applied *only* in sex crime cases in which the victim's nonconsent was legally implied based on age or incapacity.

But, that ambiguous paragraph aside, the commentary to ORS 163.325 appears to support defendant's position that there is no inherent contradiction between providing an affirmative lack-of-knowledge defense when the victim's nonconsent is legally implied because of age or incapacity and requiring the state to prove the defendant's knowledge of the victim's nonconsent when actual, rather than legally implied, nonconsent is at issue. The state's argument, once again, does not establish a legislative intent regarding the mental state that attaches to the "does not consent" requirement of ORS 163.425(1)(a) that would undermine our preliminary conclusion that the requirement is part of conduct to which—in the absence of any specification—a knowing mental state would apply.

3. *Legislative history of ORS 163.425*

We turn, finally, to the legislative history of ORS 163.425(1)(a), which defendant represents as indisputably supporting his view that the legislature intended that a defendant's knowledge of the victim's nonconsent be proved. ORS 163.425(1)(a) was enacted by the 1983 Legislative Assembly as Senate Bill (SB) 483. In SB 483, the legislature sought to add a new theory of criminal liability to the first-degree sexual abuse statute—subjecting another person to

sexual intercourse, sodomy, or sexual penetration when the victim "does not consent." SB 713 (1983), a related bill that was introduced at the same time, sought to replace the "forcible compulsion" element in most first-degree sex crimes with a combination of specified aggravating factors and a requirement that the victim "does not consent" to the sexual conduct that the relevant statute described. The most conspicuous proponent of both bills, who guided them through committee hearings in both the House and the Senate, was then-Benton County District Attorney Sandrock. In Senate committee hearings, Sandrock explained both bills as addressing a persistent problem for prosecutors: proving "forcible compulsion" under the strict standard that the first-degree sex crime statutes then employed, *i.e.*, physical force that overcomes the victim's earnest resistance or threats that would cause the victim to be in fear of "serious physical injury" or death. Tape Recording, Senate Committee on Judiciary, SB 713, Apr 7, 1983, Tape 85, Side A. *See also State v. Ofodrinwa*, 353 Or 507, 521, 300 P3d 154 (2013) (describing history).

In a hearing before the Senate Committee on Judiciary on SB 713, in response to concerns that the proposed change from a "forcible compulsion" requirement to a "victim does not consent" requirement might be unfair to defendants, Sandrock emphasized that, in his view, the state would have to prove that the victim had explicitly or implicitly *communicated* nonconsent to the defendant. That was so, Sandrock explained, because "the defendant's intent has to go to each and every element of the crime, [so] there has to be proof that he was doing it knowing that it was without her consent." Tape Recording, Senate Committee on Judiciary, SB 713, Apr 7, 1983, Tape 85, Side A (statement of Peter Sandrock).

Sandrock was wrong. He may have been relying on, but misremembering, the rule of construction set out in ORS 161.115(1), which provides, "If a statute defining an offense prescribes a culpable mental state but does not specify the element to which it applies, the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state." The rule

would not have applied to SB 483, because the bill did not, and the resulting statute does not, expressly require intent or any other culpable mental state.

In a subsequent discussion before the same committee regarding SB 483, a member of the criminal defense bar, Letourneau, expressed his opinion that imposing criminal liability based on the victim's nonconsent would be unfair unless the victim communicated that she did not consent. He advocated for adding a definition of "does not consent" that would require the victim to "manifest" her nonconsent. Tape Recording, Senate Committee on Judiciary, SB 483, Apr 13, 1983, Tape 91, Side B. Responding before the committee to Letourneau's testimony, Sandrock stated, again, that, whether or not it was spelled out in the bill, the state would bear the burden of proving each and every element of the offense, including that the defendant knew that the victim did not consent. *Id.* The committee asked Letourneau and Sandrock to work out a solution and report back. *Id.* Sandrock thereafter offered an amendment to SB 713, which involved adding a definition of "does not consent" to the general definitions that are applicable to *all* sex crimes, which would provide: "'Does not consent' means that a person does not presently and voluntarily agree by word or conduct, to engage in the sexual contact at issue, and that the defendant knows at the time of the sexual contact that that person does not so agree." Exhibit A, Senate Committee on Judiciary, SB 713, May 26, 1983.

When the Senate Committee on Judiciary took up SB 713 again in a later hearing, it decided to gut the entire proposal to replace the forcible compulsion element in the first-degree sex crimes and to instead expand the definition of "forcible compulsion" to include more conduct—"forcible compulsion" would include threats that caused the victim to be in fear of *any* physical injury, rather than only *serious* physical injury. Because that new approach did not involve adding a "does not consent" element to those first-degree sex crimes, the proposed definition of "does not consent" was no longer relevant and was not included in the amended version of SB 713 that was voted out of the committee and eventually enacted by the legislature. However, at a work

session on SB 483, the same committee discussed amending the bill to include the definition of "does not consent" that Sandrock had offered for SB 713. Tape Recording, Senate Committee on Judiciary, SB 483, June 7, 1983, Tape 189, Side B; Exhibit C, Senate Committee on the Judiciary, SB 483, June 7, 1983. Two members of the committee suggested, and committee counsel apparently agreed, that adding the definition was unnecessary because the same "does not consent" wording already appeared in a related statute (present-day ORS 163.415) and had been interpreted by the courts in that context. Tape Recording, Senate Committee on Judiciary, SB 483, June 7, 1983, Tape 189, Side B (statements of Sen Gardner and Sen Hendrickson). In fact, the "does not consent" wording had *not* been interpreted by the courts. Following the discussion, the committee decided against including the proposed definition of "does not consent" in the bill and ultimately voted SB 483 out of committee with a "do pass" recommendation.

When the House Committee on Judiciary took up the bill, Sandrock testified in its favor. In the course of his testimony, Sandrock spoke about the meaning of "does not consent" and his view that the defendant would have to know of the victim's nonconsent, regardless of any express statement to that effect in the statute:

> "The code does not contain a definition of what it means to act without consent. All I can say is that there has been no problem prosecuting cases of sex abuse in the second degree when the jury has been either given a dictionary definition or been told to figure out what no consent means.

> "* * * * *

> "Perhaps the other perceived problem is how is the prospective defendant to know that this is occurring without consent. * * * Well, I think it is a fundamental precept of criminal law that the mental element of the crime—in this case it would be intentionally or knowingly, applies to every other element of the crime. * * * In other words, the state would have to prove beyond a reasonable doubt that the defendant knew that it was without her consent that he was having that intercourse. Over on the Senate side I had a series of negotiations with Don Letourneau of

> the Metropolitan Public Defender's Office. And they sup-
> ported the bill with the proviso that there was a definition
> of the term 'without consent.' And I agreed with him to a
> proposed definition of 'without consent' as something that
> would be fitting, although in my mind not necessary for the
> bill. For whatever reason, that definition was not included
> as the bill was passed out."

Tape Recording, House Committee on Judiciary, June 30, 1983, Tape 485, Side A. When asked why the Senate had not included the definition that he and Letourneau had devised in SB 483, Sandrock could only speculate that it had been overlooked. One of the bill's sponsors, Senator Hendrickson, was present, and she told the House commit-tee that, at the Senate committee work session in which the proffered definition had been considered, the committee had not been aware that the definition was the product of an agreement between Sandrock and "the public defenders." In any event, Hendrickson added, the Senate committee had concluded that, given that the victim's nonconsent was an element of other crimes that were in statutes that the courts had interpreted, including the definition that had been offered would be "redundant" and "unnecessary." She also expressed concern about derailing the bill's enactment by adding an amendment in which the Senate would have to concur so late in the legislative session. The bill was left as it was, and the House committee voted unanimously in favor of a "do pass" recommendation. Tape Recording, House Committee on Judiciary, June 30, 1983, Tape 486, Side A. *See also Ofodrinwa*, 353 Or at 521-24.

It is difficult to know what to make of the foregoing legislative history, which shows that the committees that were involved in drafting SB 483 were presented with, but declined to adopt, an amendment that spoke directly to the mental state issue in this case. Perhaps the most plausible interpretation of what transpired is that the legislators in the two committees shared, or at least wished to accommo-date, the concerns of public defenders, by including a defini-tion of "does not consent" in the bill that expressly included a knowledge requirement, but were persuaded by Sandrock and others that doing so was unnecessary because a know-ing mental state would be required under existing law.

Under that interpretation of the legislative history, the fact that the committees were wrong about what the existing law required would not negate the fact of their belief in what it required. Neither would it negate their understanding and intentions with respect to SB 483 that were based on that erroneous belief. Whether the entire legislature was operating under the same mistaken belief when it enacted SB 483 is another question, to which we have no answer. But, so understood, the legislative history provides some support for the idea that the legislature understood and intended that the bill would require the state to prove that a defendant knew that the victim did not consent to the sexual intercourse.

Furthermore, the legislature history quite clearly shows that, in rejecting an amendment that expressly would have required the state to prove a defendant's knowledge of the victim's nonconsent, the legislature was *not* rejecting the idea that the amendment conveyed. In other words, the legislative history does not support the state's contention here—that the legislature intended and understood that proof of a knowing mental state would *not* be required with respect to the statute's "does not consent" requirement.

F.   *Synthesis*

As discussed above, the primary inquiry that the *Simonov* rule contemplates is an inquiry into whether the legislature intended and understood the element at issue as a circumstance or as an integral part of the proscribed conduct. With respect to ORS 163.425(1)(a), we have concluded that the legislature understood the requirement that the victim "does not consent" to the sexual intercourse to which the defendant subjects him or her as part of the proscribed conduct, which, under the default rule set out in *Simonov*, would require proof of at least a knowing mental state. As to the arguments that seek to directly show that the legislature did, or did not, intend to require a knowing mental state with respect to the "does not consent" requirement (which we view as secondary), none have dissuaded us from our conclusion that the requirement is a part of conduct, requiring a knowing mental state, and some appear to provide some support for that conclusion.

## III.   CONCLUSION

We conclude that the requirement in ORS 163.425(1)(a) that the victim "does not consent" is an integral part of the conduct that the statute proscribes, and that proof of a minimum mental state of "knowingly," as defined in ORS 161.085(8), is required with respect to that element. In this case, that means that the trial court erred in instructing the jury that it could find defendant guilty if he acted negligently, recklessly, or with knowledge with respect to that element. It also means that the trial court erred in entering a judgment of conviction based on the jury's determination that defendant had acted recklessly with respect to that element.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.