No. 1012 November 26, 2025 193

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RYAN JOHN SNIDER,
*Defendant-Appellant.*

Washington County Circuit Court
19CR38224; A180843

Beth L. Roberts, Judge.

Argued and submitted May 9, 2025.

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Kirsten M. Naito, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.

HELLMAN, J.

Remanded for resentencing; otherwise affirmed.

**HELLMAN, J.**

Defendant appeals a judgment of conviction on one count of first-degree unlawful sexual penetration, ORS 163.411, and two counts of first-degree sexual abuse, ORS 163.427. The counts were based on the theory that the adult victim had been asleep and therefore incapable of consent when defendant put his penis on her head and a dildo in her vagina—acts that he documented by taking pictures with his cell phone. On appeal, defendant argues that his convictions should be reversed because the trial court erred by failing to instruct the jury that the "incapable of consent" element of the offenses required a culpable mental state. Alternatively, he argues that the case should be remanded for resentencing because the court erred by imposing lifetime post-prison supervision on the conviction for first-degree unlawful sexual penetration.[1] For the reasons explained below, we conclude that the trial court did not commit reversible error when instructing the jury, but we accept the state's concession that the court erred in imposing lifetime post-prison supervision, which is authorized only when the victim of the unlawful sexual penetration is a child, not an adult. We therefore remand for resentencing to correct the error as to post-prison supervision on Count 1, but we otherwise affirm.

## I.   PROCEDURAL HISTORY

The charges in this case were brought after E reported to police that defendant, her former boyfriend, had sexually assaulted her after she had passed out during a night of drinking, and that defendant had taken pictures of the assault with his cell phone. Police obtained a search warrant for defendant's phone and computer, and they were able to locate evidence of a series of digital images on defendant's devices that included (1) a photo of E's face, her eyes closed while lying on a bed, with defendant's penis touching her forehead; (2) two photos of a E with her eyes closed and a dildo next to her face; (3) a photo of E's vagina and anus, with the tip of a dildo inserted in her vagina; and (4) a photo

---

[1] In his briefing, defendant also asserted that the trial court erred by failing to merge the guilty verdicts for first-degree sexual abuse. After the case was submitted, defendant moved to withdraw that assignment of error. We granted that motion, and accordingly, we do not address that assignment in this opinion.

of E's vagina and anus, with the dildo fully inserted into her vagina.

At the urging of the police, E made a pretext phone call to defendant in which she asked defendant about the time he "took pictures of me passed out with that dildo in me," and defendant said "I apologize. I didn't think about it." Police also interviewed defendant, who said that E had been drinking that night to celebrate his birthday and puked once or twice but had not passed out; defendant told police that, after he and E had sex, E had gone to sleep, then woke up again, and then they had sex again. During the interview, defendant denied that E was unconscious in the photos and asserted that "[s]he was awake during all these." However, he also told police that their relationship involved playing practical jokes of a sexual nature on one another and that the behavior was consistent with previous similar situations that were consensual.

In the indictment and at trial, the state proceeded on the theory that E was physically helpless at the time of the conduct depicted in the images found on defendant's devices. At trial, the state presented evidence that E had been drinking heavily on the night that the photos were taken, that she had "passed out" from drinking too much, and that defendant had committed the sexual offenses while she was asleep. The state's case included testimony from E to that effect. She testified that she was "not conscious," "not aware of anything," did not know that the photos were being taken, did not know what was being done to her, and had not consented to the photos being taken. The state also offered copies of several of the photos themselves, as well as testimony about the timestamps associated with the images. According to that testimony and timeline, two photos showing E with her eyes closed and a dildo next to her face were taken at 1:27:44 a.m. and 1:28:04 a.m. Then, about an hour later, the remaining photos were taken but, because of the switch from Daylight Savings Time at 2:00 a.m. that morning, the associated timestamps similarly reflected the 1:00 o'clock hour. The photo showing defendant's penis touching E's forehead has a timestamp of 1:26:08 a.m.; the first of a series of photos showing the tip of the dildo inserted

into E's vagina had a timestamp of 1:28:13 a.m.; and the first showing full insertion of the dildo had a timestamp of 1:30:20 a.m. The state also offered a recording of the pretext call and defendant's apology, testimony from investigating officers about defendant's statements during the interview, and a recording of that interview.

Defendant's competing theory at trial was that E and defendant were partying throughout the night to celebrate his birthday, they stopped at an adult store on the way home from a bar to purchase the dildo, the dildo was involved throughout the evening in sexual acts, and E was awake and consented to all of those sexual acts. In addition to other defense witnesses, defendant testified in his own defense and stated, as he had in the police interview, that E was awake and conscious when the pictures were taken. For example, he testified:

> "That's where the pictures come in of her with her eyes closed and me, as a joke, light-heartedly—we had a joking relationship, funny things like that—that's where I put the sex toy next to her face and took a picture. *However, she was not asleep. She was talking to me the whole time, making, you know, noises and gestures, responding to me, you know, so the whole time she was always responsive until she was sick and we went to bed. And then we went to bed.*
>
> "Q.   Okay. So what time do you think she got sick about?
>
> "A.   She got sick about 3:00 a.m.
>
> "* * * * *
>
> "Q.   And was she awake every time?
>
> "A.   Absolutely.
>
> "Q.   Participating?
>
> "A.   Yes.
>
> "Q.   Taking mutual photos of you?
>
> "A.   She's—did that to me as well."

Thus, in defendant's version of events, E was a willing participant and wanted the pictures taken. He testified that the only reason she asked defendant to delete them

was because they showed her face and tattoo. According to defendant, he had no indication that E was upset about the photos, they continued to have a consensual sexual relationship after that night—including another night of partying and drinking for E's own birthday that again involved the dildo, but no photos. It was only in January, after defendant kicked E and her kids out of his house and stopped allowing her to use one of his vehicles, that E had claimed that the conduct in November was nonconsensual and occurred while she was physically helpless.

One of the legal disputes that arose at various points in the case was the applicable mental state with respect to physical helplessness. Defendant had provided pretrial notice that he intended to raise an affirmative defense based on his own lack of knowledge that E was physically helpless.[2] At the same time, he had filed a pretrial motion arguing that the state was first required to prove a *mens rea* as to physical helplessness. Defendant then raised the latter issue again during trial, asking that the jury be instructed that the state must prove that defendant knew that E was incapable of consent by reason of physical helplessness. The state responded that controlling Oregon Court of Appeals cases had squarely rejected defendant's argument that the state was required to prove knowledge as to that element. *See State v. Phelps*, 141 Or App 555, 558, 920 P2d 1098, *rev den*, 324 Or 306 (1996) (rejecting the argument that the state was required to prove knowledge of physical helplessness); *State v. Woods*, 317 Or App 506, 513, 505 P3d 432, *rev den*, 370 Or 198 (2022) (rejecting an argument that *Phelps* was plainly wrong in that regard). The trial court agreed with the state. It instructed the jury on the affirmative defense but did not require the state to first prove a culpable mental state as to E's physical helplessness.

---

[2] ORS 163.325(3) provides that, "[i]n any prosecution under ORS 163.355 to 163.445 in which the victim's lack of consent is based solely upon the incapacity of the victim to consent because the victim is mentally incapacitated, physically helpless or incapable of appraising the nature of the victim's conduct, it is an affirmative defense for the defendant to prove that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent." *See also* ORS 161.055(2) (providing that the defendant has the burden to prove an affirmative defense by a preponderance of the evidence).

The jury found defendant guilty on all counts. The court sentenced defendant to 100 months' imprisonment on the conviction for first-degree unlawful sexual penetration, and 75 months' imprisonment on the two convictions for first-degree sexual abuse, to run concurrently with the 100-month sentence. The judgment states that defendant is subject to both 100 years of post-prison supervision and "Lifetime PPS" on the conviction for first-degree unlawful sexual penetration.

## II.  ISSUES ON APPEAL

### A.  *Instructional Error*

Defendant first asserts that the court erred when it failed to instruct the jury that the state was required to prove, as to each charged offense, that defendant acted with a culpable mental state with respect to whether E was "incapable of consent by reason of physical helplessness." Defendant's primary argument is that under *State v. Simonov*, 358 Or 531, 368 P3d 11 (2016), being incapable of consent is a material element that is properly considered a "conduct" element such that the minimum culpable mental state is "knowingly." As a result, defendant argues, the court erred by refusing to instruct the jury that the state was required to prove that he knew that E was incapable of consent because she was physically helpless.

As defendant acknowledges, we have previously held that the state is not required to prove that a defendant acted knowingly with regard to whether a victim was incapable of consent. In *Phelps*, which predated *Simonov*, we concluded that the legislature had not intended to place that burden on the state but had instead placed the burden regarding defendant's knowledge on the defendant by way of the affirmative defense in ORS 163.325(3). 141 Or App at 558-59. We stated that, "[b]y its expression in ORS 163.325(3), the legislature has indicated its intention that knowledge of the incapacity to consent of a person within the definition of ORS 163.375(1)(d) is not a material element of the offense and that that statute controls over the general mandate of ORS 161.115(2) and ORS 161.095(2)." *Id.* at 559.

More recently, in *Woods*, which was post-*Simonov*, we declined to overrule *Phelps* as plainly wrong as to whether the state must prove a defendant's knowledge of the victim's incapacity. We began our discussion by recounting the Supreme Court's approach in *Simonov* and a subsequent case, *State v. Haltom*, 366 Or 791, 794, 472 P3d 246 (2020), which had applied *Simonov* and concluded that a "knowingly" minimum culpable mental state attaches to the lack of consent element for second-degree sexual abuse. We acknowledged that statements in both *Simonov* and *Haltom*—specifically, statements to the effect that every material element ordinarily requires proof of a culpable mental state and that an element is "material" unless it relates solely to the statute of limitations, jurisdiction, venue, or the like—had "undercut[] our conclusion" that knowledge of the incapacity to consent was *not* a material element. *Woods*, 317 Or App at 515. However, we nonetheless disagreed with the defendant's argument that *Phelps* was plainly wrong as to the "knowingly" culpable mental state, given the existence of the affirmative defense:

> "In sum, nothing in *Simonov* or *Haltom* displaces our conclusion in *Phelps* that requiring proof that a defendant knew of the victim's incapacity would be inconsistent with the affirmative defense in ORS 163.325(3) and its legislative history; as a consequence, those cases are not a basis for concluding that *Phelps* is plainly wrong insofar as it rejected knowingly as a mental state, even if they give rise to the possibility that the legislature intended for a lower culpable mental state, such as criminal negligence, to apply, an issue that is not presented in this case."

*Woods*, 317 Or App at 519.

The trial court relied on our decision in *Woods*, and defendant now asks us to revisit it, arguing that the defendant in that case had not presented a developed argument about *Phelps* and that Supreme Court cases decided since then, like *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), have only cast further doubt on *Phelps*'s conclusion that "knowledge of the incapacity to consent of a person within the definition of ORS 163.375(1)(d) is not a material element of the offense." *Phelps*, 141 Or App at 559.

However, neither of those points addresses the fundamental reason that we adhered to the holding in *Phelps* regarding knowledge: the existence of an affirmative defense that expressly allocates proof of knowledge to the defendant with regard to lack of capacity to consent. *See Woods*, 317 Or App at 519. Defendant has not offered a persuasive explanation for why the *state* must prove a defendant's knowledge as to a victim's incapacity to consent in its case-in-chief when the legislature expressly required a *defendant* to prove his, her, or their knowledge as to a victim's incapacity to consent as part of the affirmative defense in ORS 163.325(3). Accordingly, we adhere to our earlier holdings rejecting "knowingly" as the minimum culpable mental state.

Defendant also raises an alternative argument about the mental state requirement. He asserts that, even if knowingly is not the minimum required mental state as to the victim's incapacity, the court was required to instruct the jury that defendant acted with at least criminal negligence as to that element. That is an issue that we left open in *Woods*, because it had not been presented in that case. 317 Or App at 519. Here, too, we do not resolve that question, but for a different reason. In this case, an instruction that the state was required to prove criminal negligence as to the incapable-of-consent element would not have made any difference to the verdict, and any error was, therefore, harmless.[3]

We will not reverse a trial court error, including error in failing to correctly instruct on the applicable mental state, if that error is harmless under both Article VII (Amended), section 3, of the Oregon Constitution and under the United States Constitution. *See State v. Perkins*, 325 Or App 624, 630-31, 529 P3d 999 (2023) (applying federal constitutional harmless error standard to a preserved claim challenging the failure to instruct on the property-value element of theft); *see also State v. Horton*, 327 Or App 256,

---

[3] The state also argues that the trial court would not have understood defendant to have been arguing for an instruction on criminal negligence, so we should reject his contentions as unpreserved. Defendant responds that he adequately raised the issue in his written memorandum, which he asked the court to consider when ruling on his requested jury instructions. We need not resolve the parties' preservation dispute because, as explained below, we conclude that any error was harmless. *See State v. Acree*, 338 Or App 98, 101, 565 P3d 60 (2025) (taking a similar approach in a similar context).

263 n 3, 535 P3d 338 (2023) (noting that we apply federal harmlessness analysis when considering federal errors). An instructional error of that nature is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Perkins*, 325 Or App at 631 (citation and internal quotation marks omitted). Under the state standard, the question is whether there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). As we have previously explained:

> "In the mental-state context in particular, the pertinent inquiry is not whether a jury could have found defendant to have the requisite mental state on this record; rather, it is whether there is some likelihood that the jury might not have been persuaded that he had the requisite mental state, had it considered that issue."

*Horton*, 327 Or App at 263 (internal quotation marks and emphases omitted).

In this case, given the evidence and the parties' competing theories at trial, as well as the fact that the jury considered and rejected defendant's affirmative defense regarding knowledge of E's lack of capacity to consent, there is no reasonable possibility that an instruction on criminal negligence as to lack of capacity would have affected the jury's verdict. During the trial, the jury was presented with two starkly different versions of what happened. E testified that she was asleep when the sexual acts occurred, and the state presented photos in which her eyes were closed and she appeared to be sleeping. Defendant, meanwhile, testified that E was awake the entire time, participating in the acts, and that she only later decided, after breaking up with defendant, that the acts were not consensual.

The parties' closing arguments reflected those divergent theories of the case. The state told the jury that it was required to prove that defendant knowingly penetrated E's vagina and subjected her to sexual conduct while she was physically helpless. The state further argued that "physically helpless" includes "somebody who's unconscious. This includes somebody who is passed out. What it has to do with is that the person is unable to consent, the person doesn't know what's

happening to them." The state asked the jury to focus on the timeline of the photos, arguing that two photos taken initially, with a dildo posed near E's face, show her eyes closed and that it is clear that she is not awake; and that, an hour later, she is again not awake when the charged sexual offenses occurred. The state pointed out that the photos appear to be staged, and that E is not laughing, smiling, or talking in any of the photos. The photos, the state argued, "speak for themselves" and "what he says about her—laughing, this is being a joke; she is awake; she is participating—there is no evidence of that other than defendant['s] statements."

Defendant, on the other hand, suggested that E's allegations occurred because her "sugar daddy, as it were, quit being that." He argued that the jury was being asked to decide whether defendant's conduct was "a crime or is it consented contact, contact consented by both parties but later, two months later, [E] decided they did not consent." According to defendant, E had been voluntarily drinking and "got so intoxicated to where she couldn't remember what happened. That's not being asleep, ladies and gentlemen, she's responding to [defendant] all the way through their contacts."

Both defendant and the state also briefly addressed the affirmative defense of lack of capacity. Defendant told the jury that, if the state were to prove all the elements beyond a reasonable doubt, defendant could establish his affirmative defense if it "is proven by a preponderance of evidence at the time—at the time of the alleged offense, the defendant did not know the facts or conditions responsible for the victim's incapacity." But his actual arguments about that defense were not about the facts or conditions responsible for the victim's *incapacity* but about E's *consent* before becoming incapacitated. In fact, the hypothetical he posed in support of his affirmative defense presumed that the person being subjected to sexual contact was asleep: "[Y]ou're in a relationship with a significant other and you love each other and you fall asleep and either they or you decide to wake up the other person by oral sex—. *** What if another person gets mad later on?"[4]

---

[4] Defendant's argument was interrupted by an objection from the prosecutor, which the court sustained by saying, "The law will come from the judge."

In rebuttal, the prosecutor addressed the affirmative defense by pointing out that "[t]here is no evidence the defendant didn't know. He knew exactly why she was passed out. He was there with her when she was drinking. It's a question, did he know she was unconscious? Did she [*sic*] know she was asleep? Did he know she was unable to consent? And when you look at the photos, those photos clearly show that she was not."

In finding defendant guilty, the jury accepted the state's version of what happened, found beyond a reasonable doubt that E was, in fact, physically helpless, necessarily rejected defendant's factual theory that E was awake and consensually participating in the conduct, and found that defendant had not proved by a preponderance of the evidence that he did not know the facts or conditions responsible for the victim's incapacity.

It is implausible on this record that members of the jury, although unpersuaded that defendant did not know the facts or conditions responsible for E's incapacity, would nonetheless have had doubt as to whether defendant was criminally negligent on that point—*i.e.*, if E was asleep as shown in the photos, defendant had not failed to be aware of a substantial and unjustifiable risk that she was incapacitated. In fact, defendant never seriously presented an alternative theory that turned on his level of awareness of the circumstances of E's incapacity. Instead, his alternative theory appears to have been that he could not have known that E had not consented to sexual acts committed *while she was sleeping*, given the parties' past sexual relationship and conduct—a different question from his mental state as to the fact that she was asleep or otherwise physically helpless.[5]

Taking all of that into account, we conclude that the jury would have reached the same verdict on each count even if it had been instructed that it must find that defendant was criminally negligent as to E's capability of consenting. We therefore affirm the judgment as to defendant's convictions.

---

[5] We note that defendant similarly conflated those issues in his pretrial memorandum, arguing that the case must be dismissed because the state would not be able to prove that he acted with criminal negligence—or disprove his lack of knowledge—because E had consented to sexual activity before falling asleep or losing consciousness.

B.   *Lifetime Post-Prison Supervision*

Last, defendant challenges the court's imposition of post-prison supervision on Count 1, which is described in the judgment both as a term of 100 years and as lifetime post-prison supervision. Defendant argues, and the state concedes, that the court plainly erred in imposing that term after the prosecutor incorrectly represented that ORS 144.103(2) required imposition of a lifetime term of post-prison supervision for first-degree unlawful sexual penetration. As the parties now agree, that subsection of the statute was inapplicable because it applies "if the victim is under 12 years of age," which E was not. We accept the state's concession, and, given the gravity of the error, the minimal judicial resources required to correct it, and the state's lack of interest in defendant serving an unlawful sentence, we reverse and remand for resentencing to impose the correct term of post-prison supervision, which the parties agree should have been 140 months under ORS 144.103(1). *See State v. Evans*, 281 Or App 771, 773, 383 P3d 444 (2016), *rev den*, 360 Or 752 (2017) (exercising discretion to correct a plainly erroneous term of post-prison supervision for similar reasons).

Remanded for resentencing; otherwise affirmed.