376 December 3, 2025 No. 1038

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID GORDON PROPP,
*Defendant-Appellant.*

Washington County Circuit Court
19CR54018, 21CR48053; A180539 (Control), A180540

Janelle F. Wipper, Judge.

Argued and submitted September 8, 2025.

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission. David Propp filed the supplemental reply brief pro se.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the answering brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. Also on the supplemental answering brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

In Case No. 19CR54018, convictions for using a child in a display of sexually explicit conduct (Counts 1-3) reversed and remanded; remanded for resentencing; otherwise affirmed. In Case No. 21CR48053, remanded for resentencing; otherwise affirmed.

**AOYAGI, P. J.**

Defendant was convicted in case number 19CR54018 of three counts of using a child in a display of sexually explicit conduct (display), ORS 163.670; four counts of luring a minor, ORS 167.057; two counts of second-degree sexual abuse, ORS 163.425(1)(a); and one count of third-degree sexual abuse, ORS 163.415. He was convicted in case number 21CR48053 of tampering with a witness, ORS 162.285. All the offenses have the same victim, B. In this consolidated appeal, defendant raises eight counseled assignments of error that challenge the denial of his motion to suppress, the jury instructions on the age element of each offense, the jury instruction on "lewd" as relevant to the display counts, and alleged prosecutorial misconduct in closing argument. Defendant also raises supplemental *pro se* assignments of error. As explained below, we reverse the three display convictions, based on instructional error regarding the age element, but we affirm the other ten convictions. We therefore remand for a new trial on the display counts and for resentencing on the other counts.

## I.  FACTS

In August 2019, defendant, age 49, contacted B on Grindr. B understood Grindr to be a hookup app for gay men. B's profile said that he was 18 years old. In fact, B was 16 years old (about to turn 17 in September). Defendant and B began messaging through the app. Defendant eventually suggested meeting in person, which led to an encounter in defendant's vehicle during which, without asking B's age, defendant initiated and engaged in sexual contact with B. Afterwards, defendant and B continued messaging each other on apps. At defendant's suggestion, B sent defendant photos of his genitals, as well as a video of himself masturbating.

Defendant proposed meeting in person again, and B agreed. Defendant picked up B a few blocks from his parents' house, drove to a nearby field, and parked near the tree line away from the road. The encounter soon turned physical. Defendant and B got into the back of the vehicle (an SUV)—where the rear seats were laid flat and a bed made

from a foam mattress, blankets, and pillows—and engaged in sexual activity. A neighbor called the police to report the parked vehicle, which had its headlights on. As described more later, two law enforcement officers responded to the call, approached the SUV on foot, and looked inside. They saw defendant and B, whom they immediately perceived to be a minor, in states of partial undress. Defendant was ordered out of the vehicle and ultimately arrested.

Based on his sexual contact and communications with B, defendant was charged with three counts of display, four counts of luring a minor, four counts of second-degree sexual abuse, and two counts of third-degree sexual abuse. Defendant was later separately charged with witness tampering, based on a Grindr message that he sent to B in 2021. The two cases were consolidated for trial, and all of the charges were tried to a jury in 2022. The primary issue at trial was defendant's mental state regarding B's age. There was really no dispute that defendant and B had sexual contact and exchanged sexual messages. For example, during opening statement, defense counsel acknowledged that the jury would "see that after they hooked up, after they had sex, those—some of those conversations became sexy" and would "see that there's cringy texts and that there's texts about them making plans" but asserted that what the jury would not see was them "learning about each other's lives and what they're doing." Defendant called an expert to testify regarding age misestimation. The jury found defendant guilty on all counts.

Defendant appeals, raising numerous assignments of error. We first address assignments of error that are relevant to all of the convictions, and then address those that are relevant to specific charges.

## II.   MOTION TO SUPPRESS

Before trial, defendant filed a motion to suppress evidence obtained from an unlawful stop. He argued that, when the officers responded to the neighbor's call about a parked vehicle, they had probable cause to conduct a traffic investigation and could have cited defendant for unlawful parking, but that they "abandoned any investigation

of unlawful parking or traffic violations" and unlawfully extended and expanded the stop into a sex crime investigation without reasonable suspicion. The trial court held a hearing on the motion, at which the state offered the testimony of the two responding officers—a police officer, Ruelas, and a code compliance officer, Reyes—as well as a bodycam video. The court concluded that the stop was lawful and denied the motion. Defendant challenges that ruling. We review for legal error, accepting the trial court's factual findings so long as they are supported by the record. *State v. Williams*, 297 Or App 384, 385, 441 P3d 242, *rev den*, 365 Or 658 (2019).

Article I, section 9, of the Oregon Constitution establishes the right of the people to be secure from "unreasonable search, or seizure." A police officer who has reasonable suspicion of a crime may conduct an investigatory stop without violating that right. *State v. Maciel-Figueroa*, 361 Or 163, 182, 389 P3d 1121 (2017). Reasonable suspicion exists when an officer subjectively believes that a person has committed or is about to commit a crime and that belief is objectively reasonable under the totality of the circumstances. *Id.* Objective reasonableness requires "specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime." *Id.* at 165. While the articulated facts need not "conclusively indicate illegal activity," they must "support the reasonable inference that a person has committed a crime." *State v. Schmitz*, 299 Or App 170, 176, 448 P3d 699 (2019) (internal quotation marks omitted).

In this case, it is uncontested that the criminal stop began when the officers ordered defendant out of his vehicle and that the officers subjectively believed at that time that defendant had committed or was about to commit a sex crime involving a minor. The only question is whether the officers' subjective belief was objectively reasonable, given the totality of the information that they had at that point.

What the officers knew at that point was as follows. It was approximately 8:00 p.m. on an August night. An SUV was parked in a rural location in Hillsboro, in the middle of a field, about 100 yards from the road, in a manner

that suggested a desire for seclusion. The vehicle had been parked there for at least half an hour, with its headlights on, and the front windshield was covered by sunshades. Inside the vehicle, there were two individuals—defendant, who appeared to be in his 40s, and B, whom both officers immediately perceived to be a minor. Ruelas perceived B to be "in his mid-teens," and Reyes perceived him to be "a juvenile" and "really young." Defendant and B were lying in the back of the SUV, where the rear seats were folded down and there were blankets and pillows. Upon seeing the officers, defendant, who was wearing only underwear (boxers), quickly sat up and climbed into the front seat and began putting on a shirt. He was visibly nervous. Meanwhile, B, still in back, was shirtless "and attempting to quickly put his shorts on." With that information, Ruelas ordered defendant out of the vehicle, initiating a stop.

The trial court did not err in concluding that the foregoing information was sufficient to give rise to objective reasonable suspicion that defendant had committed or was about to commit a sex crime against a minor. Defendant argues that the facts fell short of creating reasonable suspicion because the police did not witness any actual sexual contact and "there was no way for a reasonable viewer to discern B's age in the short time" that the officers observed him before ordering defendant out of the car. Those arguments are unavailing. The officers did not need to witness the actual crime to have reasonable suspicion of it. The totality of the circumstances amply allowed a reasonable inference of sexual activity. As for it being impossible to discern B's age in such a short time, the officers needed only an objectively reasonable suspicion that B was a minor, not definitive proof, and there is nothing unusual about quickly forming an opinion on someone's age based on their physical appearance. Both officers immediately perceived B to be under the age of 18, the trial court credited that testimony, and the bodycam video showing how B looked that night is consistent with that testimony.

The officers in this case had notably more suspicious information than the officers in *State v. Wampler*, 325 Or App 722, 530 P3d 133, *rev den*, 371 Or 477 (2023). In that

case, the defendant, a 38-year-old man, was sitting with a 15-year-old girl in a van parked about 650 feet from the public highway, on a narrow gravel road, with the van backed up to a logging gate. *Id*. at 725. The engine and lights were off. *Id.* It was approximately 9:00 p.m. *Id.* An officer saw the van while driving past on the public road, suspected criminal trespassing because it was a private logging road, and eventually approached the van to conduct a trespassing investigation. *Id.* Upon approaching the van, the officer saw a middle-aged man and a teenaged girl in the front seat. *Id*. The officer learned that the man was 38, that the girl was 15, and that the man was the girl's boyfriend's father. *Id*. at 726. Their explanation for being there (that they were turning around) did not make sense for several reasons. *Id*. We held that the circumstances were sufficient to give rise to reasonable suspicion of unlawful sexual activity with a minor, allowing the officer to extend and expand the stop to investigate that crime. *Id*. at 732. That was so even though the defendant's and the girl's "clothes were not in disarray, and they were seated in the front of the vehicle as opposed to the back." *Id.* We reasoned that the evidence was sufficient to create reasonable suspicion that defendant was "*about to* commit a crime," versus having "*already* committed a crime" as disarrayed clothing and a backseat location might suggest. *Id.* (emphases in original).

Defendant tries to distinguish *Wampler* as a case in which "the police obtained substantial information *before* initiating a stop—including the girl's precise age and that she did not share a last name with the defendant." (Emphasis in original.) We disagree. Both cases involve adult men found with teenagers in parked vehicles at night in remote locations suggestive of a desire for seclusion. *See Wampler*, 325 Or App at 732 (noting that the van's location suggested a desire for seclusion on the defendant's part). Beyond those common core facts, the circumstances here were *more* suggestive of sexual activity than those in *Wampler*. The defendant and the minor in *Wampler* were fully clothed and calmly sitting in the front of the van, whereas defendant and B were half naked lying in a makeshift bed in the back of the SUV and started scrambling to get dressed upon seeing the police. As for age, it is true that the officer in *Wampler*

had the opportunity to ask the girl her age, whereas the officers here estimated B's age based on his appearance, but we do not view that as a particularly important difference for reasonable-suspicion purposes, at least on this record. Ultimately, if the circumstances in *Wampler* were sufficient to give rise to reasonable suspicion of unlawful sexual activity with a minor, as we held they were, then the circumstances here were certainly sufficient to give rise to the same.

We note that the possibility that a situation *could* be innocent does not defeat reasonable suspicion of a crime. *Id.* at 727. "Overall, reasonable suspicion is a relatively low barrier." *State v. Roberts*, 308 Or App 225, 230, 480 P3d 1016 (2020), *rev den*, 367 Or 827 (2021) (internal quotation marks omitted). "Reasonable suspicion must be supported by specific and articulable facts," and those facts must "support the reasonable inference that the person committed or was about to commit a specific crime or type of crime," but they need not "conclusively indicate illegal activity." *Id.* (internal quotation marks omitted). Here, given the totality of the circumstances, it was reasonable for the officers to infer that defendant had engaged in or was about to engage in unlawful sexual activity with a minor, regardless of whether that was the *only* possible inference from the circumstances. It follows that the stop that occurred when the officer ordered defendant out of his vehicle was lawful, and the trial court did not err in denying defendant's motion to suppress.

## III.   CLOSING ARGUMENT

Defendant challenges four statements that the prosecutor made in closing argument that defendant claims deprived him of a fair trial. Defendant did not object to the statements when they were made, so he requests plain-error review.[1]

---

[1] "Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). We have discretion, however, to consider a "plain" error. ORAP 5.45(1). An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). A distinct body of case law has developed regarding "plain error" prosecutorial misconduct in closing argument, so we focus on that body of law in the text.

For statements in closing argument to rise to the level of reversible plain error, it must be "beyond dispute" that they "were so prejudicial as to have denied defendant a fair trial." *State v. Chitwood*, 370 Or 305, 312, 518 P3d 903 (2022) (internal quotation marks omitted). To meet that standard, the statements must have been both obviously improper *and* incurable. *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025). A statement was obviously improper if its only possible meaning was an impermissible one, whereas a statement was not obviously improper if it was susceptible to more than one interpretation by the jury, "not all of which were impermissible." *Id*. at 607. When a prosecutor's statement was obviously improper, the next question is whether it would have been curable. *Id*. at 605. "[T]he defendant must show that the prosecutor's comments were so egregious that, if the defendant had made a motion for mistrial, the trial court would have erred, as a matter of law, in denying it." *Id*. (internal quotation marks omitted). In other words, "no curative instruction would have been effective." *Id*. "That is an exceedingly high bar." *Chitwood*, 370 Or at 328; *accord Perez*, 373 Or at 605 (reiterating same); *see State v. Davis*, 345 Or 551, 583, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009) ("Generally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's misconduct.").

In this case, defendant first challenges two sequential sentences, italicized below, from a portion of the prosecutor's closing argument:

"The defendant knew that [B] was a minor. The defendant knew he was not 18 years old. In fact, the defendant was practically giddy about it. Within a matter of hours after having sexual contact with [B], he's sitting and typing poetry.

"A 49-year-old man sitting and typing poetry about the smooth skin of a boy that he knows he's hit the jackpot because it's a boy who indicated that he was 18 on an app who very clearly is not. Not only did the defendant know just based upon appearance alone, the defendant knew what he needed to do to exploit [B]."

(Emphasis added.) Defendant argues that those statements were unsupported by evidence, "attempted to play off the

jury's potential discomfort with same-sex sexual activity and relationships with an age difference," and were "highly inflammatory."

We are unpersuaded. The state's characterization of defendant as having "hit the jackpot" and its assertion that he knew how to exploit B were sufficiently tied to evidence in the record regarding defendant's conduct and communications with B that they were not obviously improper. *See State v. Arena*, 336 Or App 291, 295, 560 P3d 757 (2024) ("In closing arguments to the jury, counsel has a large degree of freedom to comment on the evidence submitted and urge the jury to draw any and all legitimate inferences from that evidence." (Internal quotation marks omitted.)). The state's mere reference to B as a "boy" cannot be fairly characterized as playing off latent homophobia. As for tapping into "potential discomfort with *** relationships with an age difference," that argument does not land well in a case where the victim was a minor and the "relationship" therefore criminally prohibited.

Defendant next challenges two other statements by the prosecutor—one in closing and one in rebuttal closing—that he contends "made light of the state's burden of proof." During closing, the prosecutor argued that, if the jury found that defendant knew that B was a minor, then defendant was guilty of the charged crimes, "[b]ecause, really, the question in this case is not whether the crimes actually happened." In context, it is apparent that the prosecutor meant that it was uncontested that the *events* happened—*i.e.*, the defense did not contest that defendant had sex with B and exchanged sexual messages with B—and that the only real question was whether defendant realized that B was a minor. At a minimum, that is one reasonable interpretation of the prosecutor's statement, so it was not obviously improper. *Perez*, 373 Or at 607. The prosecutor also would have almost certainly clarified the statement had an objection been made.

Finally, in closing argument, defense counsel said that the jury was "going to walk away from this with questions as to what actually happened in March of 2021" and that that meant that the jury had reasonable doubt. In rebuttal, the prosecutor countered that it was "absolutely

incorrect" that "walk[ing] away with questions" automatically equated to reasonable doubt. The prosecutor described reasonable doubt as "doubt based on common sense and reason" and argued that a juror might walk away from trial wondering why they did not hear about X, Y, or Z, but that the jury had to decide the case based on the evidence before it, without speculation, and that questions like wondering why they never heard about something were questions that "do not mean reasonable doubt." Even if the prosecutor's point could have been made more artfully, that attempt to clarify the reasonable doubt standard was not obviously improper.

Because none of the challenged statements were obviously improper, we need not address curability. *Id.* at 615.

## IV.   JURY INSTRUCTIONS ON AGE ELEMENTS

We now turn to the jury instructions regarding B's age. All the sexual offenses with which defendant was charged have an age element. Display can be committed only against a "child," ORS 163.670, which means a person under 18 years of age, ORS 163.665(1). Luring a minor similarly must be committed against a "minor" (or a police officer posing as a "minor"), ORS 167.057(1)(a), which means a person under 18 years of age, ORS 167.051(2). Second-degree sexual abuse as charged here requires that "the victim does not consent," ORS 163.425(1)(a), which includes lacking legal capacity to consent due to being under 18 years of age, ORS 163.315(1)(a). Third-degree sexual abuse as charged here requires that the victim "is incapable of consent by reason of being under 18 years of age." ORS 163.415(1)(a)(B).

Defendant asked the trial court to instruct the jury that, to find him guilty of display, the jury had to find that he "knew or believed that [B] was under the age of 18 at the time of the offense." He later expanded that request to include other charges. The state opposed the request, arguing that it was not required to prove any culpable mental state regarding B's age. The trial court ultimately ruled that the victim's age was a circumstance element with an attendant mental state requirement of criminal negligence.

It applied that ruling to all the sexual offenses. That is, the court instructed the jury that, for defendant to be found guilty of display, luring a minor, second-degree sexual abuse, or third-degree sexual abuse, the state had to prove that defendant "was at least criminally negligent that [B] was incapable of consent by means of being under 18 years of age."

The court also instructed the jury on affirmative defenses relating to B's age. As to the display and sexual abuse charges, the jury was instructed that if defendant proved "by a preponderance of the evidence that [he] reasonably believed [B] to be 18 years or older at the time of the offense," then he had proved the affirmative defense of ignorance or mistake and was not guilty. (The parties now agree that that affirmative defense does not actually apply to display, as discussed more later, but that is how the jury was instructed.) As to the luring charges, the jury was instructed that it was an affirmative defense if defendant "had reasonable cause to believe" that B "was not a minor." The instructions made clear that the burden of proof was on defendant to prove the affirmative defenses.

On appeal, defendant contends that the trial court erred in refusing to give his requested instruction on the age element of display—that the state had to prove that defendant knew or believed that B was under 18 years old—and, more broadly, the age element of all the sexual offenses. The crux of defendant's argument is that the victim's age is part of the conduct element for all those offenses and thus requires a culpable mental state of knowledge. The state counters that the trial court correctly concluded that the victim's age is a circumstance element for the crime of display, with an attendant culpable mental state of criminal negligence; that defendant's claim of error is unpreserved as to the luring counts; and that, as to luring and both degrees of sexual abuse, the legislature clearly did not intend the state to have to prove that the defendant knew the victim's age, given its creation of affirmative defenses regarding the victim's age on which the defendant bears the burden of proof.

Determining what mental state the legislature intended to attach to an element of a criminal offense for

which no mental state has been specified can be a challenging undertaking. Before turning to the parties' specific arguments, we lay out some general principles regarding offenses within the Criminal Code, as well as describing our understanding of how to approach that undertaking under current case law.

A.  *General Principles*

For offenses within the Criminal Code, except violations, "a person is not guilty of an offense unless the person acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state." ORS 161.095(2). "An element is 'material' unless it relates solely to the statute of limitations, jurisdiction, venue or similar matters." *State v. Simonov*, 358 Or 531, 537, 368 P3d 11 (2016) (internal quotation marks omitted).

Sometimes, the legislature has specified the required culpable mental states for all the elements of an offense—either by stating the required mental state for each element individually, or by stating a single mental state requirement that is meant to apply to every element. *See* ORS 161.115(1) ("If a statute defining an offense prescribes a culpable mental state but does not specify the element to which it applies, the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state."). Other times, the legislature has not specified the required culpable mental state for any of the elements, or it has specified the required mental state for some but not all of the material elements of the offense.

"[I]f a statute defining an offense does not prescribe a culpable mental state, culpability is nonetheless required and is established only if a person acts intentionally, knowingly, recklessly or with criminal negligence." ORS 161.115(2). The Supreme Court has interpreted that to mean that "every 'material element' of the offense ordinarily requires proof of a culpable mental state," even if none is expressly specified. *Simonov*, 358 Or at 537. The default rule is that conduct elements require an intentional or knowing mental state, while circumstance and result elements require a reckless or criminally negligent mental

state, although the legislature may of course vary from the defaults. *Id.* at 539-40 (construing ORS 161.085(7) to (10)).

By statutory definition, "conduct" refers to a *bodily movement*, or a *lack of bodily movement. See* ORS 161.085(4) (defining "conduct" as "an act or omission and its accompanying mental state"); ORS 161.085(1) (defining "act" as "a bodily movement"); ORS 161.085(3) (defining "omission" as "a failure to perform an act the performance of which is required by law"). Thus, at the most basic level, we understand "conduct" to refer to a physical act or omission by the defendant—*e.g.*, the physical act that kills someone (such as shooting a gun), the physical act that injures someone (such as punching), the act of sexual intercourse, the act of stealing something, the act of speaking threatening words, the omission of not providing necessary care, and so on. By contrast, at the most basic level, we understand "circumstance" to refer to facts external to the defendant's bodily movement that already exist or that come into existence during the bodily movement—*e.g.*, a child's presence in the room, the value of property, the proximity of a school, and so on. *See Simonov*, 358 Or at 542 (a "circumstance" is "an accessory fact" that "accompanies" but does "not modif[y]" the "defendant's conduct"). Finally, still speaking only at the most basic level, we understand "result" to refer to facts external to the defendant's bodily movement that come into existence as a consequence of it—*e.g.*, another person's death or injury, another person's fear, and so on.

Alas, it is not that simple though. As acknowledged in *Simonov*, "the line between conduct and other elements is not always easy to draw." *Id.* at 544. That is largely because "the definitions of the mental states that apply to 'conduct' indicate that they do not merely apply to a particular bodily movement; they also more broadly apply to other elements that describe the nature, that is, the essential character, of the prohibited act." *Id.* at 541. For example, when used as to conduct, "knowingly" "'means that a person acts with an awareness that the conduct of the person is of a nature so described.'" *Id.* at 540 (quoting ORS 161.085(8)). "'Nature' in turn, refers to 'the essential character or constitution of something,'" and "'so described' *** directs the reader to the statute defining

the offense, which describes the entire conduct proscribed by the legislature." *Id*. at 540-41 (quoting *Webster's Third New Int'l Dictionary* 1507 (unabridged ed 2002)).

The conduct element of an offense is therefore not necessarily limited to whatever portion of the statute identifies a bodily movement in the narrowest sense. For example, in *Simonov*, the court held that "without consent of the owner" was part of the conduct element for the offense of unlawful use of a vehicle. *Id.* at 549. In *State v. Haltom*, 366 Or 791, 824, 472 P3d 246 (2020), the court held that lack of factual consent was part of the conduct element of second-degree sexual abuse.[2] We therefore cannot simply identify the "bodily movement" at issue in a criminal statute and stop there; instead, we must engage in a more nuanced statutory construction analysis.

B.   *Methodology for Determining Culpable Mental States*

What mental state is required for a given element "ultimately is a matter of legislative intent." *Simonov*, 358 Or at 546. To discern that intent, we generally use the same methodology as for any other statutory construction issue. *Haltom*, 366 Or at 800, 803. That is, we analyze the text, context, and any helpful legislative history of which we are aware. *Id*. at 803; *see generally State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (describing methodology in detail).

In *Haltom*, the Supreme Court used a two-step approach to discern what mental state the legislature intended to apply to a particular element of a criminal offense for which no culpable mental state requirement was specified:

"[W]e think that it is reasonable to initially focus on whether the legislature that enacted the statute intended or understood the element at issue as a circumstance or as part of the conduct that the statute proscribes. Focusing on that issue honors the default rule that is at the heart of the *Simonov* analysis. Evidence directed at determining which mental state the legislature might have intended to

_____

[2] We note that, in response to *Haltom*, the legislature materially amended ORS 163.325 in 2021. Or Laws 2021, ch 410, § 1. Defendant was tried under the 2019 version of the statute, which is the same version addressed in *Haltom*.

> attach to the element at issue should then be considered to confirm or rebut any tentative conclusion reached under the default rule analysis."

366 Or at 802.

As we understand it, under the *Haltom* approach, step one is to analyze the statutory text, context, and legislative history to determine what the legislature intended or understood as to the *type* of element at issue—which allows forming a "tentative conclusion" that the legislature intended the default culpable mental state requirement for that *type* of element to attach. *Id.* Then, step two is to search the statutory text, context, and legislative history for anything that either *confirms* that the legislature intended that mental state to apply or, conversely, *rebuts* the assumption created by the default rules and suggests that the legislature intended a different culpable mental state to attach. *Id.*

What *Haltom* does not address—and what remains an open question in our view—is what it takes to overcome the "tentative conclusion" reached at the end of step one. The *Haltom* court did not find anything at step two that made it doubt its tentative conclusion that, because the element at issue was part of the conduct, the legislature intended to require a minimum culpable mental state of knowledge (the default rule for conduct). *Id.* at 823. Consequently, the court did not need to grapple with what courts should do with contradictory information found at step two. That is, if the analysis of text, context, and legislative history leads a court to conclude that the legislature intended something to be part of the conduct element—such that, by application of the statutory default rules, the minimum culpable mental state is knowledge—what at step two would be sufficient to overcome the default statute and allow reading in a different culpable mental state requirement? Context can be tricky, as discussed more shortly, and it seems potentially problematic to rely on legislative history to overcome default rules that the entire legislature voted to enact. *See Gaines*, 346 Or at 171 ("The formal requirements of lawmaking produce the best source from which to discern the legislature's intent, for it is not the intent of the individual legislators

that governs, but the intent of the legislature as formally enacted into law[.]").

Only two years after deciding *Haltom*, the Supreme Court decided *State v. Carlisle*, 370 Or 137, 515 P3d 867 (2022). Whereas *Haltom* was unanimous, *Carlisle* divided the court, producing a lead opinion, a concurrence, and two dissents—and achieving a majority only as to the disposition and a few points of reasoning. The lead opinion concludes that, as to third-degree sexual abuse based on factual nonconsent, the state need not prove that the defendant *knew* the victim did not consent to sexual contact—and it reaches that conclusion without deciding what type of element nonconsent is or what culpable mental state does attach to it. *Id.* at 165-66 (lead opinion). The concurrence concludes that nonconsent is a circumstance element and at least implies that the requisite culpable mental state is therefore criminal negligence. *Id.* at 177 (Garrett, J., concurring). Both dissents conclude that nonconsent is part of the conduct element and therefore requires knowledge, and they argue that the majority's contrary conclusion is irreconcilable with *Haltom*'s holding regarding the nonconsent element of second-degree sexual abuse. *Id.* at 178 (Walters, C. J., dissenting); *id.* at 196 (Duncan, J., dissenting).

*Carlisle* is notable in at least three regards. First, it clarifies that *Haltom*'s two-step approach is not mandatory. The three justices on the lead opinion (including *Haltom*'s author) suggest in *Carlisle* that, absent evidence of a "shared understanding" among the enacting legislators as to what type of element something was, it makes sense to abandon step one and decide entirely at step two what the legislature intended. *Id.* at 149 (lead opinion). A fourth justice rejects that approach but "agree[s] with the lead opinion that a strict, two-step 'default rule' construct is not absolutely required" and observes that the wording of *Haltom* "leaves future courts with latitude to approach the analysis differently." *Id.* at 167 (Garrett, J., concurring). After *Carlisle*, we understand *Haltom*'s two-step approach to be an available tool that we should use as appropriate but that is not strictly required. *But see id.* at 180, 182 (Walters, C. J., dissenting) (arguing that the two-step approach honors the statutory

default rules and that, "[w]hen the legislature is silent as to its intent with respect to mental state, its silence provides a reason to use the default rule it gives us, not a reason to avoid doing so").

Second, *Carlisle* illustrates that the Supreme Court itself is struggling with how best to approach statutory construction in this area—and that the law is still in flux as a result. All seven justices agreed in *Carlisle* that, when trying to decide what culpable mental state attaches to an element of a criminal offense, courts should begin by inquiring into the type of element at issue. *See id.* at 149 (lead opinion); *id.* at 167 (Garrett, J., concurring); *id.* at 180 (Walters, C. J., dissenting). The justices split from there. The three justices on the lead opinion would abandon step one and go directly to step two, except in the rare case where there is direct proof of a consensus among the enacting legislators as to the type of element at issue. *See id.* at 149 (lead opinion) ("[I]f it appears from our examination of a statute's text, context, and legislative history that the legislature had no shared understanding of whether a particular element is 'conduct' or an attendant 'circumstance,' then it makes little sense to impose our own answer to that question as a means to understanding which culpable mental state the legislature intended for the element."). The two concurring justices (one of whom also joined the lead opinion) would focus heavily on step one, discerning legislative intent as to the type of element based on normal statutory construction principles, regardless of whether there was explicit discussion of the element type. *Id.* at 167-68 (Garrett, J., concurring) (reasoning that, if we can discern what type of element the enacting legislature would have understood it to be, then "we know what mental state the legislature presumptively intended would apply"). And the three dissenting justices appear to favor using the two-step approach in every case. *See id.* at 180, 182 (Walters, C. J., dissenting) (arguing that the two-step approach honors the default rules and promotes uniformity).

Third, in conjunction with *Haltom*, *Carlisle* demonstrates how challenging it can be to decide what weight to give to statutory context. In *Carlisle*, which involved

third-degree sexual abuse based on factual nonconsent, four justices (a majority) agreed with the state that the existence of affirmative defenses for third-degree sexual abuse based on legal nonconsent (nonconsent due to age or other incapacity) was persuasive evidence that the legislature did not intend the state to have to prove the defendant knew the other person did not factually consent to sexual contact. *Id.* at 158-59 (lead opinion); *id.* at 177 (Garrett, J., concurring). However, the same court had unanimously rejected the state's virtually identical context argument in *Haltom*, which involved second-degree sexual abuse based on factual nonconsent. In *Haltom*, the court found "no inherent contradiction" in requiring the state to prove knowledge of the other person's nonconsent in cases involving factual nonconsent, while providing an affirmative defense based on lack of knowledge in cases involving legal nonconsent. 366 Or at 818. The tension between *Haltom* and *Carlisle* in that regard makes it unclear how much affirmative defenses to related offenses matter—an issue that we must confront in this case.

With that understanding of the current state of the law, we now proceed to address whether the victim's age is part of the conduct element for each of the sexual offenses at issue, as defendant claims, such that the state had to prove that defendant knew that B was a minor. We begin with the crime of display.

C. *Display*

A person commits the crime of display, as charged in this case, when a person "[e]mploys, authorizes, permits, compels or induces *a child* to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording." ORS 163.670(1)(a) (emphasis added). There is no question that the victim being "a child" is a material element of display. The parties disagree, however, as to what culpable mental state attaches to that element. The trial court ruled, and the state maintains, that "a child" is a circumstance element to which a culpable mental state of criminal negligence attaches, whereas defendant argues that it is part of the conduct element and therefore requires knowledge.

We begin with what type of element "a child" is. In our view, it is readily apparent from the statutory text and the essential character of the identified conduct that the legislature intended "a child" to be part of the conduct element of the offense.

"Employs, authorizes, permits, compels or induces" clearly refers to conduct. ORS 163.670(1)(a). It refers to a defendant's bodily movements (acts) or lack thereof (omissions)—in this case, defendant speaking or writing words to induce B to record sexually explicit images. Importantly, those are all transitive verbs. *Webster's Third New Int'l Dictionary* 146, 463, 743, 1154, 1683 (unabridged ed 2002). "A transitive verb requires an object to express a complete thought[.]" *Chicago Manual of Style* § 5.102 (18th ed 2024). As such, one cannot just say that it is unlawful "to employ" or "to authorize," as that immediately raises the question, "to employ *whom or what*?" or "to authorize *whom or what*?" A direct object is needed to answer those questions and complete the thought. Here, that direct object is "a child." ORS 163.670(1)(a). The statute prohibits "employing *a child*," "authorizing *a child*," etc. That the defendant's acts (bodily movements) are directed toward *a child* is inextricably bound up in the nature of those acts. Although the grammatical structure of a statute is not always "the whole ball game," *Haltom*, 366 Or at 255, in this case, it is a compelling indication that "a child" is part of the conduct element, *see Simonov*, 358 Or at 546 ("The grammatical role of each of the phrases in [the statute] is telling.").

Construing "a child" as part of the conduct element of the offense also is consistent with *Simonov*'s guidance that, "when an element of an offense within the Criminal Code describes the nature, that is, the essential character, of a proscribed act or omission, it generally is a conduct element." *Id.* at 546; *but see also Carlisle*, 370 Or at 172 (Garrett, J., concurring) (observing that it is more accurate, and less "conceptually muddy," to think in terms of the essential character of the "described act" instead of the "proscribed act," as all the material elements are necessary for the act to be prohibited, and so "[t]he essential character cannot be determined by asking what makes the act 'criminal'").

For the offense of display, the essential character of the act is causing the creation of child pornography. The fact that the conduct is directed toward a child is so integral to its nature, given how the statute is written, that we do not see how the legislature could have understood it as anything but part of the conduct element.

Nothing in the statutory context or legislative history sheds any additional light on the type of element the legislature intended "a child" to be. We therefore rely on the words of the enacted statute to conclude that the legislature intended "a child" to be part of the conduct element of the offense. Having concluded that it is part of the conduct element, it follows that we must tentatively conclude that the legislature intended an intentional or knowing mental state to attach to that element, based on the defaults imposed by statute. *Haltom*, 366 Or at 802 (providing for "tentative conclusion" at end of step one); ORS 161.085(7) - (8) (default mental state requirements for conduct).

The next question is whether anything in the text, context, or legislative history "rebuts" our tentative conclusion—and, if so, what that means for our ultimate conclusion. *See Haltom*, 366 Or at 802 (describing second step). It is here that we must grapple with some statutory context, as that is the only thing that we have found that potentially calls into question the legislative intent.

"Statutory context includes * * * other parts of the same bill." *LandWatch Lane County v. Lane County*, 330 Or App 468, 472, 544 P3d 428, *rev den*, 372 Or 290 (2024). In this case, the legislature enacted the display statute in 1985 as part of a bill intended to combat child pornography and the sexual exploitation of children. *See generally State v. Carey-Martin*, 293 Or App 611, 652-72, 430 P3d 98 (2018) (James, J., concurring) (summarizing legislative history of ORS 163.670). The 1985 bill created three separate crimes and an affirmative defense applicable to two of them:

> "SECTION 3. (1) It is unlawful for any person to employ, authorize, permit or induce a child under 18 years of age to engage in sexual conduct for any person to observe or to record in a photograph, motion picture, videotape or other visual reproduction.

"* * * * *

"SECTION 4.   (1)   It is unlawful for any person to sell or exhibit for money or anything of value a photograph, motion picture, videotape or visual reproduction of sexual conduct by a child under 18 years of age which has been produced in violation of the laws of this state or which has been brought into this state in violation of the laws of the United States.

"* * * * *

"SECTION 5.   (1)   It is unlawful for any person to pay or give anything of value to observe sexual conduct by a child known by the person to be under 18 years of age, or to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexual conduct by a child under 18 years of age which has been produced in violation of the laws of this state or which has been brought into this state in violation of the laws of the United States.

"* * * * *

"SECTION 7.   It is an affirmative defense to any prosecution under section 4 or 5 of this 1985 Act that the defendant, at the time of engaging in the conduct prohibited therein, did not know and did not have reason to know that the sexual conduct depicted in the photograph, motion picture, videotape or other visual reproduction involved a child under 18 years of age."

Or Laws 1985, ch 557.

Section 3, which created the crime of display, then a Class B felony, was codified at ORS 163.670 (1985).[3] Section 4, which created the crime of sale or exhibition of visual reproduction of sexual conduct by child, a Class C felony, was codified at *former* ORS 163.675 (1985), *repealed by* Or Laws 1987, ch 864, § 15. Section 5, which created the crime of paying for viewing child's sexual conduct, a Class C felony, was codified at *former* ORS 163.680 (1985), *repealed by* Or Laws 1987, ch 864, § 16. Section 7, which created an affirmative defense to the latter two crimes, applicable when the defendant "did not know and did not have reason to know"

---

[3] For amendments to ORS 163.670 (1985) since 1985, see Or Laws 1987, ch 864, § 3; Or Laws 1991, ch 664, § 5; Or Laws 2011, ch 515, § 2; Or Laws 2023, ch 407, § 2.

that the depicted child was under 18 years of age, was codified at ORS 163.690 (1985).[4]

The parties disagree as to the significance of the legislature excluding the crime of display (section 3) from application of the affirmative defense in section 7. In defendant's view, it has no significance or weighs in his favor. Defendant essentially argues that, as with the affirmative defense discussed in *Haltom*, there is no contradiction and no effect on the offense to which the affirmative defense does not apply—and perhaps that its omission from the application of the affirmative defense confirms that the legislature intended the state to prove knowledge regarding the victim's age. The state disagrees. It argues that the relative treatment of section 3 (no affirmative defense) and sections 4 and 5 (subject to affirmative defense) shows that the legislature wanted ignorance of the victim's age to be a defense to the distribution or consumption of child pornography but not to the creation of child pornography—an intent that would be thwarted by reading the display statute as requiring the state to prove that the defendant knew the victim's age.

There is certainly intuitive appeal to the state's argument. Logically, as to the offenses to which the affirmative defense applies, the existence of the affirmative defense would seem to suggest that the legislature did not intend the state to have to prove knowledge that the person was a child as an element of the offense itself. It would make little sense to require the state to prove knowledge that the person was a child and then *also* put the burden on the defendant to prove that he did not know or have reason to know that the person was a child. As a matter of policy, there are also sound reasons that, with respect to mistakes of age, the legislature might choose to impose greater liability on creators of child pornography than distributors or consumers. Creators cause the most direct harm to the children involved. They are in the best position to determine a person's actual age—and can do so *before* using them to create pornography. And requiring the state to prove knowledge of the person's age necessarily makes it more difficult to prosecute display crimes involving older children.

---

[4] For amendments to ORS 163.690 (1985) since 1985, see Or Laws 1987, ch 864, § 13; Or Laws 1991, ch 664, § 9; Or Laws 1995, ch 768, § 6.

The difficulty that we come up against, however, is twofold. First, what seems logical to us might not necessarily have occurred to the legislature, as evinced by the subsequent history of the crimes created in sections 4 and 5 of the 1985 bill. Section 4 was repealed in 1987, and another statute creating a similar crime took its place, and then both that statute and section 5 were repealed in 1995. Or Laws 1987, ch 864, §§ 4, 15; Or Laws 1995, ch 768, § 16. In 1995, the legislature essentially folded the older crimes into the newly created crime of encouraging child sexual abuse (ECSA). *See* Or Laws 1995, ch 768, §§ 2-3a. For all three degrees of ECSA, the legislature specified a knowing or reckless mental state for the fact a child is depicted. *See* ORS 163.684(1)(b) (requiring as an element of first-degree ECSA that the person "[k]nows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse"); ORS 163.686 (same for second-degree ECSA); ORS 163.687 (requiring as an element of third-degree ECSA that the person "[k]nows or fails to be aware of a substantial and unjustifiable risk" that child abuse is involved). At the same time, in Oregon Laws 1995, chapter 768, section 6, the legislature amended ORS 163.690 to its current form, which states: "It is an affirmative defense to any prosecution under ORS 163.684, 163.686, 163.687 or 163.693 that the defendant, at the time of engaging in the conduct prohibited therein, did not know and did not have reason to know that the relevant sexually explicit conduct involved a child." ORS 163.690.

Thus, in the ECSA statutes, the legislature created offenses for which the *state* must prove the defendant's knowledge or recklessness as to the victim being a child and simultaneously created an affirmative defense that allows the *defendant* to prove the opposite to avoid liability. We recognize that the ECSA statutes were enacted ten years after the 1985 bill. However, the state's argument depends on general logical assumptions about how the legislature views the relationship between offenses and affirmative defenses, as relevant to making inferences about legislative intent. Although we generally agree with that logic, here at least there is reason to question whether the logic holds for the 1985 bill, given subsequent events relating to sections 4 and

5. We are therefore reluctant to read too much into the affirmative defense in the 1985 bill, in terms of its effect on the state's burden of proof for the offenses themselves.

The second issue that we come up against is that we are not policymakers. Our task is limited to discerning what mental state the enacting legislature intended to attach to the element of display at issue. Although there could be sound policy reasons not to require the state to prove that a defendant knew the person was a child, it is unclear that the legislature made any policy decisions beyond writing the display statute in a way that made "a child" part of the conduct element. For example, the 1985 legislature appears to have been focused on pornography involving younger children, which may explain why it did not feel the need to discuss the mental state requirement for the "child" element. Had the legislature thought more about older children, it might have chosen to require only recklessness or even negligence as to the "child" element—but there is no evidence that it did so. What it did do is write a statute that makes "a child" part of the conduct element and enact default rules that require an intentional or knowing mental state for conduct.

In the end, the legislature established default rules precisely so that courts would know what culpable mental state to require when none is otherwise specified in the statute creating the offense. *See Simonov*, 358 Or at 538-40 (describing the default rule); *see also Haltom*, 366 Or at 802 (explaining that initially focusing on whether the enacting legislature "intended or understood the element at issue as a circumstance or as part of the conduct * * * honors the default rule that is at the heart of the *Simonov* analysis"). Absent truly compelling evidence that the legislature did not intend the default rule to apply, we are reluctant to conclude that, even though the legislature wrote a statute that makes "a child" part of the conduct element of display, it intended a lesser culpable mental state to apply than that provided by the default rule for conduct elements. We risk sliding into the role of policymakers when we do not honor the default rules.

We note that the parties seem to agree that the element type should drive our conclusion. Defendant urges us

conclude that "a child" is part of the conduct element and apply the default mental state requirement for conduct elements, whereas the state urges us to conclude that "a child" is a circumstance element and apply the default mental state for circumstance elements. The state does not argue that, even if "a child" is part of the conduct element, we should conclude that the legislature intended a different culpable mental state to apply to that part of the conduct element. Of course, we are not bound by the parties' arguments on matters of statutory construction, *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), but it bears mentioning that no one is arguing for a mental state other than that provided by the default rules.

There is also one other consideration, which is that display is a serious felony. It was initially a Class B felony, ORS 163.670(2) (1985), and is now a Class A felony, ORS 163.670(2), making it one of the most serious crimes that a person can commit in Oregon. That makes it at least somewhat more likely that the legislature did not intend convictions to be based on *negligent* conduct. *See Simonov*, 358 Or at 548 (reasoning that, because unauthorized use of a vehicle is a felony and carries serious consequences, it is more likely that "that the legislature did not contemplate that mere criminal negligence would suffice to establish criminal liability for UUV").

For all of those reasons, the 1985 bill, as context for the display statute, does not persuade us that the legislature intended a different culpable mental state requirement to attach to "a child" than attaches to conduct elements by default.

In sum, we conclude that the legislature intended "a child" to be part of the conduct element of display and, by extension, to require a minimum culpable mental state of knowledge. The trial court therefore erred in instructing the jury that the state needed to prove only that defendant "was at least criminally negligent" regarding B being under 18 years of age. The court should have instructed the jury that, to find defendant guilty of display, it had to find that defendant *knew* that he was employing, authorizing, permitting, compelling, or inducing *a child* to create pornography.

The remaining question is whether the instructional error was harmless, such that it is not a basis for reversal. *See State v. Shedrick*, 370 Or 255, 270, 518 P3d 559 (2022) (an instructional error is harmless and not a basis for reversal if there is "little likelihood" that it affected the verdict). We conclude that it was not harmless.

Defendant's awareness of B's age was the central contested issue at trial, and a jury could have found on this record that defendant did not know that B was under 18 years old. B had an account on Grindr (an 18-and-over platform), represented there that he was 18 but looked young, discussed preparing to go to college, and made other comments consistent with adulthood. There was no evidence that B ever told defendant his true age, and B told the police officers that he had lied to defendant about his age.

One aspect of the record makes harmlessness a closer question than it otherwise would be: The trial court instructed the jury that defendant should be found not guilty of display if he proved "by a preponderance of the evidence that [he] reasonably believed [B] to be 18 years or older at the time of the offense." Although the parties now agree on appeal that that affirmative defense (which comes from ORS 163.325) does *not* apply to display, the jury was instructed on it and necessarily rejected it in finding defendant guilty of display. That obviously makes it *less* likely that the mental-state instructional error affected the verdict. But we cannot say that there is *little likelihood* that it affected the verdict, given the difference in who bears the burden of proof. On this record, a properly instructed jury plausibly could have decided that the state failed to prove beyond a reasonable doubt that defendant knew that B was under 18, even if defendant also failed to prove that he reasonably believed B to be an adult. We therefore conclude that the error was not harmless.

Accordingly, we reverse defendant's convictions for display and remand for a new trial on those counts.[5]

_____

   [5] Because defendant will be retried on the display counts, we do not address his assignment of error challenging the jury instruction that was given on the meaning of "lewd." The state acknowledges that the law has changed on that issue since defendant's first trial, so there is virtually no chance of the issue arising again on remand. *See State v. Parra-Sanchez*, 324 Or App 712, 733, 527 P3d 1008, *rev den*, 371 Or 333 (2023) (overruling prior case law using a subjective

D.   *Third-Degree Sexual Abuse*

  A person commits the crime of third-degree sexual abuse, as charged in this case, when the person "subjects another person to sexual contact" and "[t]he victim is incapable of consent by reason of being under 18 years of age." ORS 163.415(1)(a)(B). Ignorance or mistake regarding the person's age is an affirmative defense to that theory of third-degree sexual abuse. ORS 163.325(2). To establish the affirmative defense, the defendant must prove that the defendant "reasonably believed" the person to be over 18 years of age. *Id.* ("When criminality depends on the child's being under a specified age other than 16, it is an affirmative defense for the defendant to prove that the defendant reasonably believed the child to be above the specified age at the time of the alleged offense.").

  In *Carlisle*, the Supreme Court addressed a different theory of third-degree sexual abuse—when a person "[s]ubjects another person to sexual contact" and "[t]he victim does not consent to the sexual contact." ORS 163.415(1)(a)(A); *see Carlisle*, 370 Or at 139 (lead opinion). A majority of the court agreed that the legislature did not intend a knowing mental state to attach to the "does not consent" element of that theory of third-degree sexual abuse. *Carlisle*, 370 Or at 139 (lead opinion); *id.* at 177 (Garrett, J., concurring). In reaching that conclusion, the majority viewed the existence of affirmative defenses relating to a victim's age or physical or mental condition as important context that shed light on the legislative intent as to culpable mental states generally, even though those affirmative defenses applied to theories of the offense involving legal incapacity to consent, and no comparable affirmative defense existed for lack of factual consent. *Id.* at 158-59 (lead opinion); *id.* at 177 (Garrett, J., concurring). The foregoing holding of *Carlisle* garnered majority support and therefore is precedential.

  Relying on *Carlisle*, we conclude that the legislature did not intend a knowing mental state to attach to the "victim is incapable of consent by reason of being under 18

---

standard and holding that, to prove "lewd exhibition" for purposes of the crime of display, the state must prove that the exhibition is objectively "salacious and focused on sex").

years of age" element of the third-degree sexual abuse theory under which defendant was charged. The fact that the affirmative defense of ignorance or mistake applies to that theory of third-degree sexual abuse makes the reasoning of *Carlisle* all the more compelling in this application. The trial court did not err in declining to instruct the jury that, to prove third-degree sexual abuse, the state had to prove that defendant knew that B was under 18 years of age and therefore legally incapable of consent.

E.    *Second-Degree Sexual Abuse*

A person commits the crime of second-degree sexual abuse, as charged in this case, when a person "subjects another person to sexual intercourse, [or] oral or anal sexual intercourse ***[,] and the victim does not consent thereto." ORS 163.425(1)(a). When lack of consent is based on the victim's age and resulting legal incapacity, the affirmative defense of ignorance or mistake described in ORS 163.325(2) applies.

In *Haltom*, which involved the same version of ORS 163.425 as this case, the Supreme Court held that "the requirement in ORS 163.425(1)(a) that the victim 'does not consent' is an integral part of the conduct that the statute proscribes, and that proof of a minimum mental state of 'knowingly,' as defined in ORS 161.085(8), is required with respect to that element." 366 Or at 824. The court disagreed with the state that the availability of affirmative defenses relating to the victim's age or physical or mental condition evinced a broader legislative intent not to require a culpable mental state as to the lack of consent. *Id*. at 818. We understand the court to have instead agreed with the defendant that the existence of those affirmative defenses evinced only a decision to treat nonconsent due to legal incapacity differently from factual nonconsent. *See id*. In other words, the existence of the affirmative defense in ORS 163.325(2) and other affirmative defenses relating to legal incapacity evinced the legislature's intent to relieve the state from having to prove that a defendant knew that the victim was legally incapable of consent, without undermining the legislative intent to require the state to prove that the defendant knew that a victim did not factually consent.

Both *Haltom* and *Carlisle* support the conclusion that, as to second-degree sexual abuse, when lack of consent is based on legal incapacity (rather than factual nonconsent), the state need not prove that the defendant *knew* the victim lacked capacity. It is instead the defendant's burden to prove as an affirmative defense that the defendant reasonably believed the victim had legal capacity. The existence of the affirmative defense evinces the legislature's intent to shift at least some of the burden of proof on the age element to the defendant in legal incapacity cases. It follows that the trial court did not err in declining to instruct the jury that, to prove second-degree sexual abuse, the state had to prove that defendant knew that B was under 18 years of age.

F.   *Luring a Minor*

A person commits the crime of luring a minor, as charged here, when a person "[f]urnishes to, or uses with, a minor * * * a visual representation or explicit verbal description or narrative account of sexual conduct for the purpose of inducing the minor * * * to engage in sexual conduct." ORS 167.057(1)(a). It is an affirmative defense to luring a minor "[t]hat the defendant had reasonable cause to believe that the person to whom the representation, description or account was furnished or with whom the representation, description or account was used * * * was not a minor." ORS 167.057(3)(b). Assuming without deciding that defendant adequately preserved his claim of instructional error as to the luring charges, we conclude that the same reasoning applies here as to the sexual abuse charges. The existence of the affirmative defense in ORS 167.057(3)(b) evinces the legislature's intent not to require the state to prove that the defendant knew the victim was a minor and, instead, to put the burden on the defendant to prove a reasonable mistake as to the victim's age. The trial court did not err in declining to instruct the jury that the state had to prove that defendant knew that B was a minor.

Finally, we note that, as to luring a minor and both degrees of sexual abuse, the state suggests that an argument can be made that the state need not prove *any* culpable mental state for the age element of those offenses. That is, in the state's view, the state may have been required to prove

too much by even being required to prove criminal negligence. We need not reach that issue. For present purposes, it is dispositive that the trial court properly declined to give an instruction requiring the state to prove knowledge of the victim's age to prove luring a minor or sexual abuse.

## V.   CONCLUSION

Accordingly, we reverse defendant's three convictions for using a child in a display of sexually explicit conduct, based on the instructional error regarding the required culpable mental state, and we remand for a new trial on the display counts. We affirm defendant's other eight convictions—for luring a minor, second-degree sexual abuse, third-degree sexual abuse, and tampering with a witness. Because we are reversing some convictions and affirming others, we remand for resentencing as required by ORS 138.257(4)(a)(A).[6]

In Case No. 19CR54018, convictions for using a child in a display of sexually explicit conduct (Counts 1-3) reversed and remanded; remanded for resentencing; otherwise affirmed. In Case No. 21CR48053, remanded for resentencing; otherwise affirmed.

---

[6] Because defendant will be resentenced, we need not address his *pro se* supplemental assignment of error regarding alleged errors at sentencing. His other *pro se* supplemental assignment of error pertains to the trial court's revocation of pretrial release—based on defendant being indicted for witness tampering while on release under a condition that he not commit new crimes—without an evidentiary hearing. The state argues mootness, to which defendant offers no response. Even assuming *arguendo* that the issue is not moot, we reject that claim of error on the merits.